**Jacob Ikperha ORHORHAGHE, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 92–70791.**

United States Court of Appeals, Ninth Circuit.

Argued March 18, 1994.

Submission Deferred March 18, 1994.

Resubmitted Sept. 27, 1994.

Decided Oct. 21, 1994.

---

James R. Mayock, Crosland, Strand, Freeman & Mayock, San Francisco, CA, for petitioner.

David M. McConnell, Office of Immigration Litigation, U.S. Dept. of Justice, Washington, DC, for respondent.

Before: REINHARDT and LEAVY, Circuit Judges, and Linda Hodge McLAUGHLIN,* District Judge.

REINHARDT, Circuit Judge:

This case concerns the application of the rule that evidence obtained as a result of an "egregious violation" of the Fourth Amendment must be suppressed in administrative proceedings. *See Gonzalez–Rivera v. I.N.S.*, 22 F.3d 1441 (9th Cir.1994); *Adamson v. C.I.R.*, 745 F.2d 541 (9th Cir.1984). Jacob Ikperha Orhorhaghe, a Nigerian citizen, petitions for review of the decision of the Board of Immigration Appeals which ordered him deported for overstaying his visa. *See* 8 U.S.C. § 1251(a)(2) (1988). He claims that the BIA erred in reversing the Immigration Judge's decision to suppress a passport and Form I–94 (Arrival/Departure Record) that

---

* Honorable Linda Hodge McLaughlin, United States District Judge for the Central District of California, sitting by designation.

were seized in an egregious violation of his rights. We agree. Accordingly, we grant the petition and reverse and remand.

## I. Facts [1]

In June of 1986, Michael Smirnoff, an investigator for the Immigration and Naturalization Service, received a call from a professional acquaintance, Karen Muth. Muth worked for the Bank of America, investigating credit card frauds. She had investigated a number of frauds perpetrated by Nigerian nationals, and she was "in the habit" of calling Smirnoff "everytime she [came] across a Nigerian-sounding name and asking [Smirnoff] to verify" whether the individual in question was in the country legally. This time, the "Nigerian-sounding name" belonged to Orhorhaghe.

A check of the INS computer system turned up no record of Orhorhaghe's lawful entry into the United States. Although the relevant computer system apparently did not contain records of entry prior to January 1, 1983, and Orhorhaghe *had* in fact entered the country *legally* prior to that date, Smirnoff testified that, based on his experience, Orhorhaghe "was probably an alien, was probably Nigerian, and that he was probably illegally in the United States in the absence of anything to indicate that he was here legally."

Smirnoff decided to investigate. He assembled a team of four agents: himself, Muth, INS Agent James Christenson, and Sergeant Cleaves of the Oakland Police Department. On the morning of June 20, 1986, this team went to Orhorhaghe's apartment building. Earlier that same morning, Muth had telephoned Orhorhaghe and asked if she could meet with him regarding the alleged credit card scheme. At the building, Muth called Orhorhaghe's apartment on the building's security system. When he asked who was there, she announced only herself.

Orhorhaghe told Muth that he would come down and let her in, but before he made it

down the three flights from his apartment a man (who later identified himself as the building manager) let in the entire group. When Orhorhaghe arrived downstairs and introduced himself to Muth, the others immediately walked over, and Agent Smirnoff identified himself and showed his badge. Smirnoff testified that Orhorhaghe's "eyes got as big as saucers." Although Smirnoff denied that the agents surrounded Orhorhaghe, there is no serious dispute that they narrowed his avenues of potential escape within the apartment hallway.

After putting his hand on his hip—something he says he did not do "merely to reveal the fact that I was carrying a gun"—Smirnoff told Orhorhaghe words to the effect of "Let's go into your apartment." The agents then followed Orhorhaghe upstairs to his apartment. At the doorway of the apartment, Orhorhaghe asked the four agents if they had a warrant, in response to which Smirnoff told him "that we didn't need a warrant to talk to him." Smirnoff then, somewhat redundantly, asked if the agents could come into the apartment. Orhorhaghe replied "come in," and the agents entered the apartment.

In the apartment, the agents questioned Orhorhaghe. In response to the agents' questioning, he told them that he was a Nigerian citizen. However, he claimed to have lawful immigration status in the United States. Smirnoff asked whether he had a passport, and Orhorhaghe said that he had lost it. He told the agents that he possessed a police report which would explain the loss of the passport. Although Orhorhaghe did not tell the officers where the police report was, he headed toward the rear bedroom.

The agents followed. In the bedroom, Orhorhaghe found a briefcase. He opened it briefly, looked through the contents, and quickly closed it. He told the officers that he could not find the police report. During the moment that the briefcase was open, Smir-

---

1. Only two witnesses testified at the hearing: Michael Smirnoff and Jacob Orhorhaghe. The Immigration Judge (and subsequently the BIA) credited Smirnoff's testimony wherever it conflicted with Orhorhaghe's. The Immigration Judge stated: "I feel certain of my finding as to

credibility. I do not consider it to be a 'borderline' credibility case." Because we see no reason for upsetting the BIA's credibility determination, this statement of facts follows the version laid out in Smirnoff's testimony.

noff saw what looked like the green cover of a passport. He told Orhorhaghe to step back, and Orhorhaghe protested. Smirnoff testified that Orhorhaghe asked whether the officers had a warrant, and that he replied by asking "what that had to do with the price of tea in China.". Smirnoff opened the briefcase and discovered Orhorhaghe's Nigerian passport. Orhorhaghe's INS Form I–94 was tucked inside the passport. These documents indicated that Orhorhaghe had entered on a tourist visa on October 13, 1982, and that this visa had expired on October 31, 1982, over three and a half years earlier. The agents arrested Orhorhaghe; a subsequent search of the apartment uncovered documents which indicated that he had attempted to obtain a California birth certificate.

An order to show cause issued, which charged that Orhorhaghe was subject to deportation under the former section 241(a)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(2) (1988), "in that, after admission as a nonimmigrant under Section 101(a)(15) of said Act you have remained in the United States for a longer time than permitted." Deportation proceedings took place before an Immigration Judge on August 7 and November 14, 1986, as well as January 9, 1987. The Immigration Judge essentially bifurcated the proceedings. He stated that the proceedings would focus exclusively on the question of deportability. Only if he concluded that Orhorhaghe was deportable would he then entertain any application for relief from deportation. Orhorhaghe denied deportability and filed a motion to suppress all fruits of the June 20 encounter in his apartment building.

On January 9, 1987, the Immigration Judge rendered his decision. He first granted Orhorhaghe's motion to suppress. He found that Smirnoff's search of the briefcase did not satisfy the requirements of the plain view doctrine and therefore constituted an egregious violation of the Fourth Amendment. Because all of the evidence which showed that Orhorhaghe had overstayed his visa had been obtained as a result of this violation, the Immigration Judge found that

the government had not carried its burden of proving that Orhorhaghe was deportable.

On September 21, 1992, the Board of Immigration Appeals reversed. It held that Smirnoff did not violate the Fourth Amendment at any point during the June 20 encounter at the apartment, and that, in any event, he did not commit any "egregious" violation warranting suppression of evidence. The BIA therefore ordered Orhorhaghe deported to Nigeria. On October 6, 1992, the INS filed a motion for reconsideration which pointed out that the BIA had failed to consider whether Orhorhaghe was eligible for relief from deportation. Accordingly, the BIA on November 10, 1992, ruled that he was ineligible—as a matter of discretion—for voluntary departure. The BIA made this ruling despite the fact that Orhorhaghe had not had an opportunity to apply for relief from deportation before the Immigration Judge and he had therefore not had any opportunity to introduce any evidence or arguments relevant to such an application. Orhorhaghe appeals both the finding of deportability and the denial of relief from deportation.

## II. Egregious Fourth Amendment Violation

Orhorhaghe argues that Agent Smirnoff and his compatriots committed numerous egregious violations of his Fourth Amendment rights. Although we do not agree with all of his claims, we do conclude that the agents committed egregious violations by seizing Orhorhaghe outside of his apartment, and by conducting a nonconsensual warrantless entry into his apartment, in both instances on the basis of his Nigerian-sounding name. Accordingly, we agree that the BIA erred in reversing the Immigration Judge's grant of the motion to suppress.

### A.

In *I.N.S. v. Lopez–Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984), the Supreme Court held that the Fourth Amendment exclusionary rule does not apply in deportation proceedings. *See id.* at 1050, 104 S.Ct. at 3489. However, the Court expressly left open the possibility that the exclusionary rule might still apply in cases

involving "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." *Id.* at 1050–51, 104 S.Ct. at 3489 (citing, *inter alia, Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952); *Matter of Toro,* 17 I. & N. Dec. 340, 343 (1980)).[2]

In *Adamson,* we took up the Supreme Court's suggestion. We held that, even in administrative proceedings in which the test announced in *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), (and applied in *Lopez–Mendoza*[3]), eliminates the exclusionary rule, administrative tribunals are still required to exclude evidence that was "obtained by deliberate violations of the fourth amendment or by conduct a reasonable officer should know is in violation of the Constitution." *Adamson,* 745 F.2d at 545 (citing *Lopez–Mendoza,* 468 U.S. at 1050–51, 104 S.Ct. at 3489–90). Applying the same balancing test the Supreme Court had applied in *Janis* and *Lopez–Mendoza,* we held that when evidence is obtained by such an egregious violation of the Constitution, "the probative value of that evidence cannot outweigh the need for judicial sanction." *Id.* In *Gonzalez–Rivera,* 22 F.3d at 1448–52, we applied the "egregious violation" exception—suggested in *Lopez–Mendoza* and adopted in *Adamson*—to require the sup-

pression of evidence in a civil deportation hearing.[4]

■ Thus, although as a general matter the exclusionary rule does not apply in deportation (and some other types of administrative) hearings, under the clearly established law of this circuit evidence must be suppressed if it was obtained through an egregious violation of the Fourth Amendment. In order to determine whether the agents in this case committed such violations, we must first determine whether the agents violated the Fourth Amendment. If they did, then we must determine whether the agents committed the violations deliberately or by conduct a reasonable officer should have known would violate the Constitution.[5]

**B.**

Applying settled principles of Fourth Amendment law to the facts developed before the Immigration Judge, we conclude that Smirnoff and his fellow officers violated that Amendment in at least two respects. First, their contacts with Orhorhaghe inside the apartment building prior to entering his apartment constituted a "seizure" for which the agents did not have a sufficient articulable basis. Second, the agents conducted a warrantless entry into Orhorhaghe's apart-

**2.** Although only four justices joined in this portion of the opinion (Justices O'Connor, Blackmun, Powell, and Rehnquist), the four dissenters (Justices Brennan, White, Marshall, and Stevens) argued that the exclusionary rule ought *ordinarily* to apply in deportation hearings. Thus, to the extent such head-counting is a helpful way of reading Supreme Court opinions, there were eight votes on the *Lopez–Mendoza* Court for at least leaving open the possibility that the exclusionary rule might apply to egregious violations. *See Gonzalez–Rivera,* 22 F.3d at 1448 n. 2.

**3.** The *Janis* Court held that the exclusionary rule did not apply in a federal civil tax proceeding to bar the introduction of evidence which had been unlawfully seized by *state* officials. The *Lopez–Mendoza* Court considered itself bound by the *Janis* analysis: "Applying the *Janis* balancing test to the benefits and costs of excluding concededly reliable evidence from a deportation proceeding, we therefore reach the same conclusion as in *Janis.*" *Lopez–Mendoza,* 468 U.S. at 1042, 104 S.Ct. at 3485.

**4.** Gonzalez–Rivera reached the same conclusion as our earlier opinion in *Arguelles–Vasquez v. I.N.S.,* 786 F.2d 1433, 1435 (9th Cir.1986), *vacated as moot,* 844 F.2d 700 (9th Cir.1988). Because the opinion was vacated, *Arguelles–Vasquez* is no longer binding circuit precedent. *See, e.g., County of Los Angeles v. Davis,* 440 U.S. 625, 634 n. 6, 99 S.Ct. 1379, 1384 n. 6, 59 L.Ed.2d 642 (1979). However, it is still persuasive authority. *See, e.g., id.* at 646, 99 S.Ct. at 1390 (Powell, J., dissenting) ("The Court's disposition today will leave the decision of the Court of Appeals on the merits as the most pertinent statement of the governing law, even if that decision is not directly binding.").

**5.** See, e.g., *Gonzalez–Rivera,* 22 F.3d at 1445–52 (resolving the Fourth Amendment question first, then determining whether the Fourth Amendment violation was egregious).

ment without securing his voluntary consent.[6]

■■■■■ *1. The Contacts Prior to Entering the Apartment*—Law enforcement agents have the "liberty (again, possessed by every citizen) to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away." *Terry v. Ohio,* 392 U.S. 1, 32–33, 88 S.Ct. 1868, 1885–86, 20 L.Ed.2d 889 (1968) (Harlan, J., concurring). However, agents are not free to restrain other people at will. When an encounter between a law officer and another person escalates to the point where it is considered a "seizure," the officer must have a reasonable, articulable basis for his actions. (*See infra* next section for a discussion of this requirement). Thus, as an initial matter, we must determine whether the agents' conduct prior to entering Orhorhaghe's apartment constituted a "seizure" for purposes of the Fourth Amendment. We conclude that it did.

In *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), the Supreme Court reaffirmed the established standard for determining when an encounter with law enforcement officers becomes a "seizure": "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id.* at 437, 111 S.Ct. at 2387 (quoting *Michigan v. Chesternut,* 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565 (1988)); *accord United States v. Anderson,* 663 F.2d 934, 939 (9th Cir.1981). The circumstances surrounding the agents' questioning of Orhorhaghe indicate that a reasonable person in his position would not have felt at liberty "to decline the officers' requests or otherwise terminate the encounter." *Bostick,* 501 U.S. at 436, 111 S.Ct. at 2387.

First, Orhorhaghe was faced with "the threatening presence of several officers." *Benitez–Mendez v. I.N.S.,* 760 F.2d 907, 909 (9th Cir.1983). When Orhorhaghe left his apartment, he reasonably expected to meet a single bank investigator, Muth. However, in the hallway he met *four* people, one of whom identified himself as an INS agent. For all Orhorhaghe knew, all four of the people in the hallway were armed and in league with the INS agents. (In fact, three of them were armed law enforcement personnel). As was the defendant in *United States v. Bloom,* 975 F.2d 1447, 1454 (10th Cir.1992), Orhorhaghe "was outnumbered, and he knew it."[7] Although the agents did not block off all of his possible escape routes, their presence in the hallway significantly limited his avenues of egress.[8] In that contained area, the agents were only a few steps away from being able to prevent Orhorhaghe's exit.[9] Indeed,

---

6. Orhorhaghe also claims that the opening of the briefcase and the seizure of the documents was not justified by any exception to the warrant requirement. Because we conclude that the officers' entry into Orhorhaghe's apartment violated the Fourth Amendment, we need not consider this question.

7. The court in *Bloom* held that the presence of *two* DEA agents questioning a single suspect "'increase[d] the coerciveness of [the] encounter'" and weighed in favor of finding a seizure. *Id.* (quoting *United States v. Ward,* 961 F.2d 1526, 1533 (10th Cir.1992)).

8. The INS places great emphasis on Agent Smirnoff's testimony that he and his three compatriots did not surround Orhorhaghe. The Immigration Judge credited Smirnoff's testimony, and there is no basis for upsetting this determination. Nevertheless, even the agent's own version of events makes clear that Orhorhaghe did not have complete freedom of movement. The relevant portion of Smirnoff's direct examination was as follows:

> Q. Okay. In Paragraph 3 of the declaration, the respondent states that it was apparent to him that he was surrounded and cornered with no avenue of escape. Is .. that how it appeared to you?
> A. It appeared to me that the respondent was, in fact, inside of a building. Now whether he constitutes [*sic*] that cornering, I don't know, but he certainly had a way to go.
> Q. Did .. all the officers and the investigator surround the respondent?
> A. No.

(ellipses in original).

9. Thus, this case is not like *United States v. $25,000 U.S. Currency,* 853 F.2d 1501, 1504–05 (9th Cir.1988). In that case, the court concluded that an encounter between three officers and one suspect did not, under all of the circumstances, constitute a seizure. In *$25,000,* one of the officers was four to five feet away from the suspect,

Agent Smirnoff testified that the agents attempted to make certain that Orhorhaghe could not escape.

Second, Smirnoff made it clear to Orhorhaghe by his actions that he was carrying a weapon. The INS argues that *"no weapons were displayed, although three of the officers—in plainclothes—happened to be carrying concealed weapons."* Respondent's Brief at 32 (emphasis in original). However, neither the Immigration Judge nor the BIA made any such finding, and the record makes clear that Smirnoff *did* reveal his weapon to Orhorhaghe. Orhorhaghe's declaration stated that Smirnoff "put his hands on his hips in such a way as to reveal that he was carrying a gun on his right hip." Pointedly, Smirnoff did not deny Orhorhaghe's allegation. Rather, in a telling exchange, he attempted to skirt this issue:

Q. Going back to Mr. Smirnoff, did you put your hands on your hips to reveal that you were carrying a gun on your hip?

A. I didn't put my hands on my hip *merely to reveal the fact that I was carrying a gun,* I often put my hands on my hip simply because it's a comfortable position to keep my hands in.

Q. Okay. Were you carrying a gun on that date?

A. Yes.

Q. And how were you carrying it?

A. Concealed.

Q. Concealed in what?

A. In the fact that it was under my coat.

Q. Okay. Was it in a holster?

A. Yes, it was.

(emphasis added). The only fair interpretation of this exchange is that Agent Smirnoff revealed his concealed firearm to Orhorhaghe by placing his hand on his hip. Although Smirnoff's primary purpose was not necessarily to display his weapon, it was a necessary effect of his placing his hand on his hip, and it may have been an intended one. We have often stated that an officer's display of firearms weighs in favor of a finding that a seizure occurred. *See, e.g., $25,000,* 853 F.2d at 1505; *Benitez–Mendez,* 760 F.2d at 907.[10]

█ Third, the nonpublic setting substantially increased the coercive nature of the encounter, and it too militates strongly in favor of finding a seizure here. The initial confrontation between the agents and Orhorhaghe took place in the hallway of his apartment building—private property shielded from the view of the vast majority of the public. Indeed, the interrogation occurred in Orhorhaghe's place of residence, the area which has the highest "measure of protection" under the Fourth Amendment. *La-Duke v. Nelson,* 762 F.2d 1318, 1328–29 (9th Cir.1985), *modified on other grounds,* 796 F.2d 309 (9th Cir.1986). Of course, the fact that a confrontation between law enforcement officers and an individual takes place in a private place does not in itself transform that encounter into a "seizure." Nevertheless, in this case the agents' actions demonstrated that they could intrude into highly protected areas such as Orhorhaghe's residence. These actions therefore enhanced a reasonable person's perception of the agents' authority and made it more likely that a reasonable person would not have felt free to terminate the encounter.

Finally, Agent Smirnoff acted in an officious and authoritative manner that indicated that Orhorhaghe was not free to decline his requests. In *United States v. Patino,* 649 F.2d 724 (9th Cir.1981), we held that a seizure can occur "when the officer merely indicates by his authoritative manner that the person is not free to leave." *Id.* at 727. Agent Smirnoff's own testimony makes clear

the encounter occurred in a public place, the suspect "could have easily" walked away from the officers, and "[t]he officers showed no sign of force or aggression, and at no time did they raise their voices or show their firearms." *Id.* at 1505. Here, although the record does not indicate the precise distance between the officers and Orhorhaghe, it is clear that they were all in close proximity to each other. In addition, the encounter here took place in the hallway of a *private* apartment building, Orhorhaghe could *not* have easily walked away, and an agent showed Orhorhaghe that he was carrying a gun.

10. In finding that a seizure occurred in *Bloom,* the Tenth Circuit relied in part on the fact that one of the two agents who questioned the defendant was in uniform and visibly armed. *See Bloom,* 975 F.2d at 1454.

that he acted in such a fashion. After enticing Orhorhaghe out of his apartment with Muth's misleading story, and surprising him in the hallway with four officers instead of the single bank inspector he expected,[11] Smirnoff identified himself as an immigration officer. Smirnoff immediately instructed Orhorhaghe to take the agents to his apartment. The tenor of the agent's instruction was not that of "every citizen" addressing questions to fellow citizens; it was brusque and authoritative and appeared to give Orhorhaghe no option to refuse to comply. Smirnoff testified that he said words to the effect of "Let's go into your apartment." To a reasonable person under the circumstances, this statement bears the indicia of a command, not a request.

Despite the strong impression conveyed by Smirnoff's instruction to Orhorhaghe, at no point during the encounter did any of the four agents advise him that he was free to decline their instructions and to terminate the encounter. We have previously held that officers' failure to provide such a warning weighs in favor of finding a seizure. *See Patino*, 649 F.2d at 727; *see also Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion) (same). Given the coercive circumstances of the agents' meeting with Orhorhaghe, it is difficult to see how in the ab-

sence of a warning a reasonable person would gain the impression that he was free to leave.[12]

■ These factors all make clear that the agents "seized" Orhorhaghe in his apartment hallway. Moreover, even if no "seizure" occurred in the hallway, it is clear beyond all doubt that Agent Smirnoff's conduct at the doorway to Orhorhaghe's apartment perfected the "seizure." At the doorway, Orhorhaghe asked the agents whether they had a warrant. Agent Smirnoff "told him that we didn't need a warrant to talk to him." Any reasonable person witnessing this exchange would conclude that, by inquiring about a warrant, Orhorhaghe expressed his preference to bring the encounter with the agents to a close. Although Smirnoff's response was literally true—government agents do not need a warrant merely to "talk" with someone[13]—in context the clear purport of his statement was that Orhorhaghe was *not* free to terminate the encounter unilaterally.

■ *2. Basis For the Seizure*—We therefore conclude that the agents' contacts with Orhorhaghe prior to entering his apartment did constitute a "seizure" for Fourth Amendment purposes. Accordingly, we must next decide whether the agents had a sufficient articulable basis for making that seizure. We conclude that the basis was insufficient as a matter of law.

---

**11.** Orhorhaghe argues that the agents' warrantless entry into the building was itself illegal. We disagree. The record makes clear that an individual inside the complex, who later identified himself as the building manager, opened the door for the agents. However, a reasonable person who expected to meet a single bank investigator outside of his apartment complex may have been startled, discomfited, and intimidated to be faced with *four INS* agents (at the time, Orhorhaghe had every reason to believe that all of the agents worked for the INS) *inside* the building's hallway. Although the agent's entry into the building was not illegal, the *manner* of that entry weighs in favor of finding a seizure.

**12.** Citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 249, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973), the INS argues that the government has no duty to demonstrate that the subject of a search knew of his right to refuse. *Bustamonte* does not support a finding that no seizure occurred here, for two reasons. First, that case did not involve the question whether a seizure occurred; it involved the related but distinct question whether a person's consent to a search was

voluntary. Second, although the *Bustamonte* Court stated that the prosecution need not prove that the subject knew of his right to refuse in order to establish a voluntary consent, it did hold that "the subject's knowledge of a right to refuse is a factor to be taken into account" in the voluntariness determination. *Id.*

**13.** The INS argues that Smirnoff's statement was justified under Section 287(a)(1) of the INA, 8 U.S.C. § 1357(a)(1), which gives INS agents statutory "power without warrant to interrogate any alien or person believed to be an alien as to his right to remain in the United States." However, as the Supreme Court made clear in a case involving the very same provision of the INA, " 'no Act of Congress can authorize a violation of the Constitution.' " *United States v. Brignoni-Ponce*, 422 U.S. 873, 877, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975) (citation omitted). The Fourth Amendment "limit[s] exercise of the authority granted by both § 287(a)(1) and § 287(a)(3)." *Id.* at 884, 95 S.Ct. at 2582.

■ A government agent may conduct a "seizure" of a person in order to investigate whether that person is an illegal alien. However, to justify the seizure the agent must "articulate objective facts providing a reasonable suspicion that [the subject of the seizure] was an alien illegally in this country." *Benitez–Mendez*, 760 F.2d at 909.[14] The specific facts articulated by the agents must provide a "rational basis for separating out the illegal aliens from American citizens and legal aliens." *Nicacio v. I.N.S.*, 797 F.2d 700, 705 (9th Cir.1985). The INS argues that at the time of the seizure Agent Smirnoff was aware of three specific facts which indicated that Orhorhaghe was an illegal alien: (1) "Orhorhaghe" is a "Nigerian-sounding name"; (2) Orhorhaghe's name did not appear in INS computer records of lawful entries into the United States; and (3) Muth had told Agent Smirnoff that she suspected Orhorhaghe of participating in a fraudulent credit card scheme.

None of these facts, individually or collectively, provided a rational basis for believing that Orhorhaghe was an illegal alien rather than a legal alien or a United States citizen. Moreover, we find that the sole basis for the seizure was the defendant's racial background or national origin, a basis that was itself unreasonable. The agents' inquiry into Orhorhaghe was prompted solely by the unreasonable deduction that because he possessed a "foreign-sounding" surname, he was an illegal alien. The additional two factors on which the agents claim to have based their actions in fact provided no information whatsoever that could in any way legitimately have added to their suspicion.

■ Orhorhaghe's "Nigerian-sounding name" is clearly insufficient to justify a seizure. The parties do not cite—and we have been unable to locate—any Ninth Circuit cases which specifically address the constitu-

tionality of seizures which are based on the subjects' foreign-sounding names. However, the issue in this case is directly analogous to that considered in the long line of cases—beginning with *Brignoni–Ponce*, 422 U.S. at 886–87, 95 S.Ct. at 2582–83—which have held that "Hispanic-looking appearance and presence in an area where illegal aliens frequently travel are not enough" to justify a seizure by immigration officials. *Nicacio*, 797 F.2d at 703; *see Gonzalez–Rivera*, 22 F.3d at 1447–48. Indeed, the Seventh Circuit in *Illinois Migrant Council v. Pilliod*, 540 F.2d 1062, 1070 (7th Cir.1976), *mod'd en banc on other grounds*, 548 F.2d 715 (7th Cir.1977), treated seizures based on foreign appearance and seizures based on foreign-sounding surnames as raising identical issues under *Brignoni–Ponce*.

As with appearance, one cannot rationally or reliably predict whether an individual is an illegal alien based on the sound of his name. Reliance on either of these factors places a great deal of discretion in the immigration agents who are called upon to make the subjective judgments necessary to determine whether someone's name or appearance is sufficiently "foreign" to justify a belief that the person is an illegal alien. Furthermore, just as a person who looks Hispanic is as likely to be an American citizen or legal immigrant as he is to be an illegal alien,[15] a person with a Nigerian-sounding name might well be a native-born American of Nigerian ancestry, a naturalized American citizen, or a legal immigrant. Many if not all Americans have "foreign sounding" names, depending on which countries of origin we consider foreign. Absent other factors, there is no reason to believe that a person with a Nigerian-sounding name is an illegal alien rather than a citizen or a person with some other legal status. *Cf. Shurberg Broadcasting v. F.C.C.*, 876 F.2d 902, 955 (D.C.Cir.1989) (MacKinnon, J., concurring in denial of re-

---

14. Nearly all of the cases regarding the level of suspicion necessary to justify a seizure involve encounters on public streets or common carriers. A stricter standard of justification may apply where, as here, the encounter takes place inside a residence, for "[j]udicial concern to protect the sanctity of the home is ... elevated." *United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990). Because we conclude that the seizure in

this case cannot be justified even under the standards applied to encounters in public places, we need not decide that question here.

15. See *Brignoni–Ponce*, 422 U.S. at 886, 95 S.Ct. at 2583 ("[l]arge numbers of native-born and naturalized citizens have the physical characteristics identified with Mexican ancestry").

hearing en banc) ("With all the intermarriages, having a Hispanic surname is no guarantee that a person is 'Hispanic' or a minority to any substantial degree. . . ."), *rev'd on other grounds, Metro Broadcasting v. F.C.C.,* 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990).

Finally, allowing INS agents to seize and interrogate an individual simply because of his foreign-sounding name *or* his foreign-looking appearance risks allowing race or national-origin to determine who will and who will not be investigated. The sound of one's name often serves as a proxy in many people's minds for one's race or national origin. The government itself sometimes relies on such proxies for salutary purposes. Many race-based affirmative action policies rely upon surnames to classify people along racial or ethnic lines. *See, e.g., Metro Broadcasting,* at 550 n. 1, 110 S.Ct. at 3002 n. 1; *Minnick v. California Dep't of Corrections,* 452 U.S. 105, 109 nn. 6–8, 101 S.Ct. 2211, 2214 nn. 6–8, 68 L.Ed.2d 706 (1981). Courts have also treated people with certain types of names as a distinct racial group for purposes of the administration of school desegregation decrees. *See, e.g., San Francisco NAACP v. San Francisco Unified Sch. Dist.,* 576 F.Supp. 34, 53 (N.D.Cal.1983). The proxy is more frequently used, however, for less benevolent purposes. As courts have recognized, discrimination against people who possess surnames identified with particular racial or national groups is discrimination on the basis of race or national origin. *See, e.g., Serna v. Portales Municipal Schools,* 499 F.2d 1147, 1153–54 (10th Cir.1974). In light of this deeply-entrenched association between surnames and particular racial or national groups, we conclude that INS targeting of individuals on the basis of their foreign-sounding names raises precisely the same concerns regarding racial discrimination that compelled our decision in *Gonzalez–Rivera.* *See Gonzalez–Rivera,* 22 F.3d at 1449–50; *see also id.* at 1452 (Tang, J., concurring).[16]

We do not believe that cases such as *Brignoni–Ponce, Nicacio,* and *Gonzalez–Rivera* would have had different results if the INS agents had identified their suspects by searching through the telephone book for Hispanic-sounding surnames rather than watching passing motorists for Hispanic-looking drivers. Although a subject's foreign-sounding name, like his foreign-looking appearance, may in some cases be "a relevant factor" in determining whether immigration officers were justified in making an investigatory seizure, *Brignoni–Ponce,* 422 U.S. at 887, 95 S.Ct. at 2583, it is clearly insufficient "standing alone." *Id.* The agent's decision to make the seizure must always be rooted in some substantial basis in addition to the subject's appearance or name. In this case, the two other facts known to Smirnoff were wholly irrelevant. They provided no reasonable basis, even in combination with the sound of Orhorhaghe's name, to believe that Orhorhaghe was in this country illegally.

The absence of any record of Orhorhaghe's entry into the United States from the INS computer system did not provide any additional basis for suspecting that he was an illegal alien rather than a legal alien or American citizen. INS agents would be unable to locate any entry records for literally millions of people who are legitimately present in the United States. Most obviously, there would be no occasion to record the entry of native-born American citizens, even those with "foreign-sounding" names. In addition, it appears that the INS's entry records went back only as far as 1983. Smirnoff testified that the Non–Immigrant Index System "was only brought into existence in [*sic*] January 1, 1983; therefore, anybody entering the country prior to that time, would naturally not be included in that system." A check of this system in 1986 (when Smirnoff searched for Orhorhaghe's records) was highly unlikely to turn up any records, even for those who had legally entered the country just a few years earlier. Indeed, Orhorhaghe *had* entered the country *legally* in

16. Indeed, of all of the cases involving people who were stopped or searched because of their "foreign-looking" appearance or "foreign-sound-

ing" names, we are not aware of any in which the targeted individuals were Caucasian.

1982. Thus, the absence of any entry record appears to have resulted solely from the date on which he entered, rather than any illegality in his entry.[17]

In sum, the absence of any entry record for Orhorhaghe provided no information beyond that provided by his foreign-sounding name alone. Both facts collectively are at least as consistent with Orhorhaghe's legal presence in the country as with illegal alien status. Thus, neither provides a "rational basis for separating out the illegal aliens from American citizens and legal aliens." *Nicacio*, 797 F.2d at 705. Although Smirnoff stated that his "[e]xperience has shown that when you are unable to locate any record of an individual under their apparent true names ... nine times out of ten, the individual is, in fact, illegally present in the United States," the incomplete nature of the INS records alone is sufficient to render Smirnoff's experience-based inference valueless. We need not consider the other flaws or fallacies in his statement. For, notwithstanding Smirnoff's experience, the objective fact is that the absence of a name from the three years of records is of no legal or practical significance. As the *Nicacio* court explained, an agent's invocation of his experience is insufficient to justify a seizure in such circumstances:

> An agent's experience might make a situation suspicious to him which to the untrained or inexperienced eye would pass unnoticed or seem innocent. Such "permissible deductions," or "rational inferences," must, however, flow from objective facts and be capable of rational explanation. While an officer may evaluate the facts supporting reasonable suspicion in light of his experience, experience may not be used to give the officers unbridled discretion in making a stop.

*Id.* (citations omitted). Smirnoff's conclusion is contradicted by the objective facts. Thus, despite the deference courts owe to law enforcement officers' experience, we cannot rely upon his inference that the absence of entry records made it likely that Orhorhaghe was an illegal alien.

■ Finally, we conclude that Muth's suspicions regarding Orhorhaghe's participation in a fraudulent credit card scheme were also insufficient to justify the immigration agents' seizure of Orhorhaghe. In fact, it adds nothing whatsoever to the first two inconsequential factors. The INS provided no evidence (and makes no argument) that participation in a credit card scheme—much less *suspicion* of participation in such a scheme—can in any way be correlated with illegal alien status.[18] Surely United States citizens have been suspected far more often than illegal aliens of having defrauded credit card companies—and indeed of having committed far worse offenses.

We conclude that the immigration agents failed to demonstrate a rational, articulable basis for their seizure of Orhorhaghe. The only reason for the agents' actions was that Orhorhaghe had a foreign-sounding name that caused them to suspect that he was an illegal alien. Accordingly, the agents violated the Fourth Amendment, and all evidence

---

**17.** There may also have been another record-keeping system in existence at the time Smirnoff searched for Orhorhaghe's records. However, although Smirnoff claimed that the INS's records showed every legal entry of an alien into the United States, he was forced to admit that there was no record for Orhorhaghe's legal entry. At best, the record is ambiguous on this point. Because the *government* bears the burden of justifying a warrantless seizure, *see United States v. Delgadillo–Velasquez*, 856 F.2d 1292, 1295 (9th Cir.1988), we must construe this ambiguity against it. *See United States v. $191,910.00 in U.S. Currency*, 16 F.3d 1051, 1059 n. 15 (9th Cir.1994). In any event, these factual questions are of no significance. As we have pointed out in the text, no matter how perfect the data base as to those entering the country, it would not reflect the names of those born here, whether those names were foreign-sounding or seemed to be "American".

**18.** The BIA's only statement on this point is that "both officials [Smirnoff and Muth] were aware that there were several Nigerian nationals who participated in schemes to defraud credit card companies." This statement says nothing about whether these Nigerian nationals were legally in the United States, whether the "several" Nigerian nationals constituted the entire universe of participants in fraudulent credit card schemes, and whether there is anything about the schemes that is correlated to the participants' immigration status.

**500**

obtained as a result of the encounter was the fruit of this violation.

■ *3. Consent to Enter the Apartment* —There is an independent ground for our conclusion that Agent Smirnoff and his compatriots violated the Fourth Amendment. Not only did they seize Orhorhaghe without sufficient basis, but they also acted unreasonably by entering Orhorhaghe's apartment without securing his voluntary consent. Thus, an unlawful search transpired, even aside from the illegality of the seizure. In *Bustamonte,* 412 U.S. at 248–49, 93 S.Ct. at 2058–59, the Supreme Court set forth the standard for determining whether a consent is voluntary under the Fourth Amendment. The Court stated:

> [W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.

*Id.* The consent inquiry thus depends on many of the same factors as the determination whether the agents "seized" Orhorhaghe. However, we weigh these factors somewhat differently in reaching our conclusion that Orhorhaghe's consent to enter the apartment was *not* voluntarily given. In particular, in reaching this conclusion we rely more heavily on the events that occurred at the doorway to Orhorhaghe's apartment.

Even if we did not conclude that Orhorhaghe was "seized" in the hallway, we would be required to hold that his consent to the entry of his apartment was not voluntary. Although the agents' four-to-one advantage and Smirnoff's display of his weapon are

again factors to be considered in arriving at our conclusion, *cf. United States v. Marshall,* 488 F.2d 1169, 1189 (9th Cir.1974) (stating that the presence of several officers with *drawn* guns vitiates consent), we rely to a greater extent this time on Smirnoff's statement at the doorway that the agents did not need a warrant. This statement is particularly significant with respect to the determination whether Orhorhaghe allowed the agents into his apartment voluntarily, or whether he did so under "duress or coercion, express or implied." *Bustamonte,* 412 U.S. at 248, 93 S.Ct. at 2059.

During the initial encounter with the agents in the hallway, Smirnoff revealed that he was carrying a gun and then told Orhorhaghe, "Let's go into your apartment." Orhorhaghe complied with this instruction and returned to his apartment, with the agents following. At the door of the apartment, Orhorhaghe asked if the agents had a warrant. Smirnoff replied "that we didn't need a warrant to talk to him." In context, it is clear that Orhorhaghe was not asking whether the agents had the authority to *talk* to him, but rather that he was inquiring whether they had the authority to *enter his apartment.* Smirnoff's response clearly and deliberately misled Orhorhaghe. Although he did not actually say that the agents did not need a warrant to enter the apartment, this is precisely the information Agent Smirnoff communicated to Orhorhaghe. He did so in a manner bound to confuse a person who is not well versed in our nation's constitutional limitations on government conduct. In context, there is no doubt that Smirnoff's statement was intended and received as an assertion that the agents had the legal power to enter the apartment without a warrant.[19]

■ It is well established that there can be no effective consent to a search or seizure if that consent follows a law enforcement officer's assertion of an independent right to engage in such conduct. As the Supreme Court explained in *Bumper v. North Car-*

---

**19.** Although we do not rely on this fact here, we note that Smirnoff expressed his general view on the importance of having a warrant for a search when, after Orhorhaghe asked him whether he

had a warrant to search the briefcase, Smirnoff replied by asking "what that had to do with the price of tea in China." *See supra* note 2.

*olina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968):

> When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority.

*Id.* at 548–49, 88 S.Ct. at 1792. *Bumper* was a case in which the prosecution sought to justify the search of a house on the basis of the owner's consent. The evidence at the suppression hearing showed that the owner consented only after the police officer stated that he had a warrant to search the house. The Court held that the officer's statement rendered the consent invalid:

> When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent.

*Id.* at 550, 88 S.Ct. at 1792. *Bumper* thus stands for the proposition that a consent is ineffective if it follows "an express or implied claim by the police that they can immediately proceed to make the search in any event." 3 Wayne R. LaFave, *Search and Seizure* § 8.2(a), at 176 (1987).

As we have explained, it is clear that Agent Smirnoff's statement that he "didn't need a warrant" constituted just such an implied claim of a right to conduct the search. By letting the agents into his apartment, Orhorhaghe "show[ed] no more than acquiescence to a claim of lawful authority." *Bumper,* 391 U.S. at 549, 88 S.Ct. at 1792. Because he did not voluntarily consent to their entry, the agents' actions were unlawful, and all evidence discovered in the apartment was the fruit of this violation.

### C.

■ Because we have concluded that the agents violated the Fourth Amendment, we must now consider whether the violations were sufficiently egregious to warrant the application of the exclusionary rule in these civil deportation proceedings. As noted above, we held in *Adamson* that evidence must be excluded when it "is obtained by deliberate violations of the fourth amendment, or by conduct a reasonable officer should know is in violation of the Constitution." *Adamson,* 745 F.2d at 545. We conclude that the unjustified seizure of Orhorhaghe, and the unlawful entry of his apartment without effective consent, both of which were based on the unfounded and unwarranted assumption that people with certain foreign-sounding names are likely to be illegal aliens, constituted egregious Fourth Amendment violations. Because the evidence obtained as a result of these violations was the only evidence presented by the government to carry its burden of demonstrating that Orhorhaghe had overstayed his visa, we reverse the order of deportation. However, before discussing the reasons for our conclusion that the agents committed an egregious violation in this case, we must first address a more general objection raised by the INS.

■ *1. Probative Value*—Seizing on the *Lopez–Mendoza* Court's statement that "we do not deal here with egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained," *Lopez–Mendoza,* 468 U.S. at 1050–51, 104 S.Ct. at 3489, the INS argues that any violations that may have occurred here were not egregious, because they did not undermine the probative value of the evidence seized. It is true that the agents' Fourth Amendment violations do not make Orhorhaghe's passport and I–94 form any less probative of his illegal status. However, a Fourth Amendment violation need not undermine the probative value of the evidence seized in order to warrant suppression under the "egregious violation" exception. Were the rule to the contrary, the egregiousness exception would have little meaning, for the fruits of an illegal search or seizure ordinarily consist of physical evidence, the reliability of which is in no way affected by the manner in which the evidence is obtained.

First, under the law of this circuit egregious violations are defined without reference

to the probative value of the evidence obtained. In fact, we held in *Adamson* that "[w]hen evidence is obtained by deliberate violations of the fourth amendment, or by conduct a reasonable officer should know is in violation of the Constitution, *the probative value of that evidence cannot outweigh the need for a judicial sanction.*" *Adamson,* 745 F.2d at 545 (citing *Lopez–Mendoza*). The rule enunciated in *Adamson* was not based on the effect a constitutional violation might have on the reliability of evidence obtained by the government—indeed, it expressly requires suppression of even the most probative evidence. Rather, it was rooted in "the vital function of preserving judicial integrity," a function that is implicated *whenever* government agents deliberately or unreasonably violate rights of privacy guaranteed by the Fourth Amendment. *Id.* at 546. As we have previously explained, *see Gonzalez–Rivera,* 22 F.3d at 1451, *Adamson* disposes of the INS's contention.

Second, as we explained in both *Gonzalez–Rivera* and *Arguelles–Vasquez,* a close reading of the *Lopez–Mendoza* dictum indicates that a Fourth Amendment violation can be "egregious" even without undermining the probative value of evidence the government obtains as a result. *See Gonzalez–Rivera,* 22 F.3d at 1451; *Arguelles–Vasquez,* 786 F.2d at 1434–35. The *Lopez–Mendoza* Court did not state that its egregious violation exception would apply *only* in a case in which the violation "might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." Rather, it simply stated that *"we do not deal here"*

with such a violation. *Lopez–Mendoza,* 468 U.S. at 1050–51, 104 S.Ct. at 3489.

An analysis of the authorities relied upon by the Court in *Lopez–Mendoza* makes clear that an egregious Fourth Amendment violation warrants suppression in a deportation hearing even if the seized evidence is highly reliable and probative. Most notably, the Court cited only one case as direct support for its egregious violation exception—*Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), a case in which police officers forced the accused to ingest an emetic solution so that he would vomit up capsules of morphine he allegedly had swallowed shortly before. The evidence obtained in *Rochin* was clearly no less probative because it was obtained through the use of unreasonable force.

In language which is particularly relevant here, Justice Frankfurter's opinion for the Court stated that "[i]t has long since ceased to be true that due process of law is heedless of the means by which otherwise relevant and credible evidence is obtained." *Id.* at 172, 72 S.Ct. at 210. It is evident that *Rochin* does not stand for the proposition that a constitutional violation must undermine the reliability of evidence in order to be egregious—quite the contrary. It stands for the proposition that the government's *manner* of obtaining evidence can be so offensive as to warrant suppression *regardless of the probative value* of the evidence obtained. The *Lopez–Mendoza* Court's citation to *Rochin* incorporates this proposition into the egregious violation exception.[20]

Thus, we conclude that a violation of the Fourth Amendment can be egregious under

**20.** However, *Lopez–Mendoza* did not impose a *requirement* that a search or seizure involve physical brutality to warrant suppression. As we stated in *Adamson:* "Although *Rochin* involved physical brutality that the Court said 'shocks the conscience,' we do not believe the *Lopez–Mendoza* Court's citation to *Rochin* was meant to limit 'egregious violations' to those of physical brutality." *Adamson,* 745 F.2d at 545 n. 1.

As *Gonzalez–Rivera* and *Arguelles–Vasquez* explained, *Lopez–Mendoza* also supported its exception by citing *Matter of Toro,* 17 I. & N. Dec. 340 (BIA 1980). In *Toro,* the respondent argued that INS agents stopped her for questioning solely because of her Hispanic appearance. Although the BIA held that it was not fundamentally unfair

to admit the evidence which resulted from the stop, it reached this conclusion because the stop at issue occurred nearly a year before the Supreme Court in *Brignoni–Ponce* made clear that stops based solely on Hispanic appearance violate the Fourth Amendment. *See Toro,* 17 I. & N. Dec. at 343–44. The analysis applied in *Toro,* which is consistent with what this circuit applied in *Adamson, see Gonzalez–Rivera,* 22 F.3d at 1451; *Arguelles–Vasquez,* 786 F.2d at 1435 n. 4, would apparently require suppression of the fruits of any stop based solely on Hispanic appearance today, because, nearly twenty years after *Brignoni–Ponce,* there can be no doubt that such stops violate the Fourth Amendment. *See id.* at 1435.

*Adamson* and *Lopez–Mendoza* even without undermining the probative value of the evidence obtained by the government. *See Gonzalez–Rivera*, 22 F.3d at 1451 ("[U]nder both *Lopez–Mendoza* and controlling Ninth Circuit law, a fundamentally unfair Fourth Amendment violation is considered egregious regardless of the probative value of the evidence obtained.").[21]

*2. Was the Violation Egregious?* —On the facts of this case, we have little difficulty in determining that the immigration agents committed egregious Fourth Amendment violations. The agents targeted Orhorhaghe for investigation simply because he had a "Nigerian-sounding name." Although they cited the fact that no record of his entry existed in the INS database, and that a bank investigator suspected him of participating in a fraudulent credit card scheme, these additional facts added nothing to the inferences or lack thereof regarding Orhorhaghe's immigration status. The seizure was essentially based entirely on the foreign sound of his name. Indeed, it is quite clear that the seizure—and the subsequent nonconsensual entry into the apartment—would never have occurred but for the fact that, to the INS and the Bank of America, "Orhorhaghe" sounded like a Nigerian name. Smirnoff testified that he targeted Orhorhaghe for investigation as a direct result of Muth's practice of contacting him whenever she came across a "Nigerian-sounding name."

The events in this case took place over a decade after the Supreme Court held in *Brignoni–Ponce* that immigration agents may not effect an investigative seizure of a suspected illegal alien solely because of his Hispanic appearance. As explained above, the *principle* applied in *Brignoni–Ponce* applies to *any* seizure that is justified on the basis of superficial and subjective indicia of national origin. In *Gonzalez–Rivera*, we made this point clear. In explaining why a race-based investigatory stop constituted an egregious violation under *Adamson*, we noted that "we have long regarded racial oppression as one of the most serious threats to our notion of fundamental fairness and consider reliance on the use of race or ethnicity as a shorthand for likely illegal conduct to be 'repugnant under any circumstances.'" *Gonzalez–Rivera*, 22 F.3d at 1449 (citation omitted). We also noted that "racial stereotypes often infect our decision-making processes only subconsciously" and that "Border Patrol officers may use racial stereotypes as a proxy for illegal conduct [or illegal alien status] without being subjectively aware of doing so." *Id.* at 1450. These considerations apply with equal force when immigration agents target individuals solely on the basis of their foreign-sounding names. Like one's appearance, one's name is frequently correlated with one's racial or ethnic background, and in both instances the racial or ethnic background which results in adverse action by immigration officers almost always is that of people of color.

Because the *Brignoni–Ponce* principle was firmly established at the time Smirnoff and his compatriots went to Orhorhaghe's apartment,[22] we conclude that a reasonable officer should have known that both the seizure of Orhorhaghe and the unlawful entry into his apartment violated the Constitution.[23] Thus, under *Adamson*, we hold that the Fourth Amendment violations were egregious. *See Adamson*, 745 F.2d at 545; *see also Arguelles–Vasquez*, 786 F.2d at 1435 (holding that a violation of the well-established rule of

---

21. Despite some language that is susceptible of misconstruction, *Cervantes–Cuevas v. I.N.S.*, 797 F.2d 707 (9th Cir.1985), is not to the contrary, as we have previously held. *See Gonzalez–Rivera*, 22 F.3d at 1451–52. In *Cervantes–Cuevas*, the court did not find the detention *illegal* and thus did not set forth any holding regarding egregiousness. *See id.* at 709–10.

22. We note, as well, that nearly two decades had passed since the Supreme Court's *Bumper* decision, which established that there can be no voluntary consent following an officer's assertion of authority to search.

23. This is especially true in light of the extensive training INS agents receive in Fourth Amendment law. The Court in *Lopez–Mendoza* specifically relied on the existence of the INS's "comprehensive scheme for deterring Fourth Amendment violations by its officers" in concluding that the exclusionary rule would not ordinarily apply in deportation proceedings. *Lopez–Mendoza*, 468 U.S. at 1044–45, 104 S.Ct. at 3486. A reasonable officer who receives such training should be aware of basic principles of Fourth Amendment law which have been consistently espoused for over a decade.

*Brignoni–Ponce* constituted an egregious violation of the Fourth Amendment).[24]

In addition, the Fourth Amendment violations in this case touch on principles of "fundamental fairness." *Lopez–Mendoza*, 468 U.S. at 1050, 104 S.Ct. at 3489. Law enforcement targeting of an individual based solely on superficial and subjective evidence of the subject's national origin implicates two basic principles: the basic principle against legal proscriptions which result in arbitrary and discriminatory enforcement of the law, *see Kolender v. Lawson*, 461 U.S. 352, 357–58, 103 S.Ct. 1855, 1858–59, 75 L.Ed.2d 903 (1983), as well as the basic principle against invidious classifications based on race or national origin. *See Gonzalez–Rivera*, 22 F.3d at 1449–50. Thus, as we did in *Gonzalez–Rivera*, we find *Adamson* and *Lopez–Mendoza* controlling, and we conclude that egregious Fourth Amendment violations occurred.[25]

**D.**

Although it does not cast its argument in terms of harmless error, the government as-serts two possible theories on which it claims that the agents' conduct meets that standard. We reject these theories.

■■■ First, the government argues that any Fourth Amendment violation was harmless because the Immigration Judge admitted the INS Form I–213 ("Record of Deportable Alien") that Agent Smirnoff completed about two hours after Orhorhaghe's arrest. If admissible, this record would clearly support Orhorhaghe's deportation order, for it states that Orhorhaghe's visa expired on October 31, 1982, and that he received no extensions. However, as the INS concedes, the I–213 "was prepared based upon statements made by Mr. Orho and upon what Officer Smirnoff learned as a result of the arrest." Respondent's Brief at 42. If the seizure of Orhorhaghe in the hallway or his consent to the officers' entry into his apartment was illegal, then the I–213 form was suppressible as the fruit of the unlawful conduct. The government admits as much. *See* Respondent's Brief at 44 n. 14.[26]

■■■ Second, the government argues that any error in the admission of the fruits

---

**24.** Relying on the *Adamson* court's holding that no egregious violation occurred in that case because "the constitutional questions are close enough that a reasonably competent police officer could have believed that the search was legal," *id.* at 546, the INS argues that the constitutional question here is close as well. However, we do not believe that a reasonable officer could believe that a seizure based on Orhorhaghe's "Nigerian-sounding" name was constitutional under *Brignoni–Ponce*. Nor do we believe that a reasonably competent police officer could have believed that Orhorhaghe's consent, given after Smirnoff's assertion that he did not need a warrant, could justify the warrantless entry into the apartment. These points are fully developed in the text. Only one part of the INS's argument deserves an additional response: the INS argues that the specific statutory authorization for INS agents to conduct warrantless interrogations of any persons believed to be aliens disposes of Orhorhaghe's claim. Although there is an exception to the exclusionary rule for objectively reasonable reliance on a statute, *see Illinois v. Krull*, 480 U.S. 340, 349, 107 S.Ct. 1160, 1166, 94 L.Ed.2d 364 (1987), it was not objectively reasonable for Agent Smirnoff to rely on the statutory authorization in this context. As discussed above, *Brignoni–Ponce* explicitly states that the statutory authorization to interrogate suspected aliens must yield to the dictates of the Fourth Amendment, and that the reach of the statute is limited by the rule enunciated in that case. *See supra* note 14.

**25.** The government contends that *Cervantes–Cuevas* dictates a contrary result. However, in *Cervantes–Cuevas*, the INS agents justified the seizure on the basis of a number of specific, articulable facts aside from the petitioner's Hispanic appearance. *See Cervantes–Cuevas*, 797 F.2d at 709–10. Thus, unlike Agent Smirnoff and his compatriots, the immigration agents in *Cervantes–Cuevas* complied with the mandate of the Supreme Court in *Brignoni–Ponce*.

*Benitez–Mendez v. I.N.S.*, 760 F.2d 907 (9th Cir.1985), is distinguishable on similar grounds. In that case, the petitioner did not even allege that the Fourth Amendment violation in his case amounted to egregious conduct. Moreover, the petitioner in that case did not allege that he was stopped because of superficial and subjective factors relating to his national origin at all; he merely claimed that the INS agents lacked any reasonable grounds to believe that he was an illegal alien. *See Gonzalez–Rivera*, 22 F.3d at 1451 n. 9.

**26.** The government argues that Orhorhaghe's attorney waived the right to challenge the admission of the I–213. However, Orhorhaghe expressly sought to bar "the introduction of all evidence in this matter which is the fruit of an illegal stop, interrogation, search and seizure undertaken on or about June 20, 1986." By its terms, this motion clearly applies to the I–213 form. Any subsequent actions by Orhorhaghe's

500… 

of the search and seizure was harmless because "Mr. Orho's brief to this Court includes his *admission* that he entered the United States in 1982, on a B–2 tourist visa." Respondent's Brief at 44. The government argues that Orhorhaghe has all but admitted that he overstayed his visa, because he has not contended that his visa was extended or his immigration status changed. However, as we made clear in *Iran v. I.N.S.*, 656 F.2d 469, 472 (9th Cir.1981), in cases (such as this one) involving immigrant overstays, the INS bears the burden of proving deportability by convincing evidence even after it has established alienage. Under *Iran*, it is not enough for the government to show that Orhorhaghe entered in 1982 on a B–2 visa. It is the government's burden to present evidence showing that Orhorhaghe received no extension or change in immigration status. Because the government does not point to any such evidence, we reject its contention.[27]

### III. *Conclusion*

We conclude that the Board of Immigration Appeals erred in reversing the Immigration Judge's grant of Orhorhaghe's motion to suppress. We agree with the Immigration Judge that, when the evidence obtained as a result of the egregious Fourth Amendment violations are excluded, the INS has failed to carry its burden of demonstrating that Orhorhaghe overstayed his visa under 8 U.S.C. § 1251(a)(2) (1988). Accordingly, we grant the petition for review and reverse the judgment of the BIA.

PETITION FOR REVIEW GRANTED. REVERSED and REMANDED.

attorney are simply too ambiguous to undercut the clear import of this motion.

**27.** We note further that the admission is also a fruit of the unlawful search and seizure, because Orhorhaghe made the admission only in order to defend against the seizure.