**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

OUMAR SISSOKO; JULIE SISSOKO,
       *Plaintiffs-Appellees,*

v.

LOYDA R. ROCHA; UNITED
STATES OF AMERICA,
       *Defendants-Appellants.*

No. 02-56751

D.C. No.
CV-98-07010-ABC

OUMAR SISSOKO, an individual;
JULIE SISSOKO, an individual,
       *Plaintiffs-Appellees,*

v.

ALBERTO R. GONZALES,* Attorney
General, Attorney General of the
United States; U.S. IMMIGRATION &
NATURALIZATION SERVICE; DORIS
MEISSNER, Commissioner, United
States INS; RICHARD NMI ROGERS,
District Director, United States
INS; FOUR UNKNOWN NAMED
OFFICERS, of the United States
Immigration and Naturalization
Service; UNITED STATES; U.S.
PUBLIC HEALTH SERVICES; JOSEPH
CHEN, MD; UNKNOWN NAMED

No. 03-55667

D.C. No.
CV-98-07010-ABC

ORDER AND
OPINION

*Alberto R. Gonzales is substituted for his predecessor, John Ashcroft, as Attorney General of the United States, pursuant to FED. R. APP. P. 43(c)(2).

2687

EMPLOYEES OF THE UNITED STATES
PUBLIC HEALTH SERVICES,
                    *Defendants,*

            and

LOYDA R. ROCHA, Immigration
Inspector, United States INS,
                    *Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of California
Audrey B. Collins, District Judge, Presiding

Argued and Submitted
March 1, 2004—Pasadena, California

Filed March 16, 2006

Before: Otto R. Skopil, Jr., John T. Noonan, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

**COUNSEL**

Peter D. Keisler, Assistant Attorney General, Debra W. Yang, U.S. Attorney, Robert M. Loeb, and Richard A. Olderman,

Civil Division, Appellate Staff, U.S. Department of Justice, Washington, D.C., for the defendants-appellants.

Martin Simone and Helen Wong, Frank, Greenberg, Simone & Stefanski, Los Angeles, California, for the plaintiffs-appellees.

---

## ORDER

The opinion filed on June 13, 2005 and reported at 412 F.3d 1021 (9th Cir. 2005) is hereby withdrawn and replaced by the concurrently-filed opinion. The pending petition for rehearing and rehearing en banc is denied as moot. Further petitions for rehearing and/or rehearing en banc may be filed.

---

## OPINION

BERZON, Circuit Judge:

After Oumar Sissoko ("Sissoko"), an alien who had overstayed his visa but had applied for legalization, returned from his father's funeral in the spring of 1997, an immigration inspection officer, appellant Loyda R. Rocha, took him into custody as an "arriving alien" without proper admission documents. Because of Rocha's actions, Sissoko spent nearly three months in detention. Sissoko and his wife Julie Sissoko, a U.S. citizen, brought this action, claiming that the detention was in violation of the Fourth Amendment and seeking damages. Rocha now appeals the district court's grant of summary adjudication to the Sissokos on the issue of the legality of the detention, and the court's denial of Rocha's motion for summary judgment on qualified immunity grounds.

Rocha's initial contention is that, under 8 U.S.C. § 1252, the courts are closed to the Sissokos. We disagree. After con-

cluding that § 1252 does not preclude jurisdiction over this case, we affirm the district court's grant of summary adjudication to the Sissokos and denial of summary judgment to Rocha on qualified immunity, and remand for further proceedings.

## I.  BACKGROUND

### A.  Facts

#### 1.  Sissoko's 1997 inspection and detention

Sissoko, a native and citizen of Senegal, first entered the United States in the early 1980s on a visitor's visa, which he overstayed. In 1990, he filed an application for legalization with the Immigration and Naturalization Service (INS),[1] pursuant to a relief order resulting from class action litigation. *See Catholic Soc. Servs., Inc. v. INS*, 232 F.3d 1139, 1141-45 (9th Cir. 2000) (en banc) (*CSS*); *see also Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43 (1993). The INS denied Sissoko prima facie membership in the *CSS* class, but allowed him to submit additional documentation to establish his eligibility.

Instead of doing so, Sissoko filed a second legalization application in 1991, containing information in some respects inconsistent with the first one. The INS, after reviewing Sissoko's 1991 application, provisionally designated him "CS-1," indicating that he was prima facie eligible for membership in a *CSS* sub-class and entitling him to issuance of a temporary resident card and employment authorization card. As a consequence of his dual applications, Sissoko was assigned

---

[1] The INS was abolished on March 1, 2003, and its functions were transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 471, 116 Stat. 2135, 2205. We refer to the agency as the INS here, however, because all of the proceedings at issue in this case took place before the transfer. *See Minasyan v. Gonzales*, 401 F.3d 1069, 1072 n.4 (9th Cir. 2005).

two different alien registration numbers, one for each of his two applications.

Sissoko's father died in March 1997, while both legalization applications were pending. Sissoko, understandably, wanted to attend his father's funeral in Senegal. A temporary resident may return from a trip abroad if he obtains an advance parole document permitting him to travel and return, usually within thirty days.[2] Sissoko therefore asked for and received from the INS an advance parole document (Form I-512), *see* 8 C.F.R. § 212.5(f) (2005),[3] giving him permission to travel to and remain in Senegal for up to thirty days. Within the prescribed time Sissoko returned to the United States, landing at Dulles International Airport outside Washington, D.C.

The Dulles immigration inspector did not believe Sissoko's account of his initial arrival in the United States sixteen years prior. The inspector also noticed that Sissoko had two alien registration numbers. Despite Sissoko's advance parole authorization, the inspector denied him entry and ordered him to report to the Los Angeles Deferred Inspection Unit.

On May 14, when Sissoko appeared for his scheduled appointment at the Los Angeles Deferred Inspection Unit, he was taken into custody by Rocha, an immigration inspector. Rocha indicated on Form I-275 ("Withdrawal of Application for Admission"), that the "Basis for Action" was that Sissoko was "Ordered removed (inadmissible) by INS — Section

---

[2]The thirty-day requirement comes from 8 C.F.R. § 245a.1(g), which defines a "[b]rief, casual, and innocent" departure as one for which advance parole is obtained "of not more than thirty (30) days for legitimate emergency or humanitarian purposes unless a further period of authorized departure has been granted in the discretion of the district director or a departure was beyond the alien's control." *See also* 8 C.F.R. §§ 245a.2(*l*)(2), 245a.4(a)(7), 245a.4(b)(12)(ii) (same definition).

[3]Unless otherwise indicated, all citations to the *Code of Federal Regulations* are to the 2005 version.

235(b)(1)." Rocha later stated in a declaration in this case that she took Sissoko into custody after learning from someone at the INS's East Los Angeles legalization office, a separate office of the INS responsible for processing legalization applications such as Sissoko's, that Sissoko had no status permitting him to remain in the United States. Sissoko was detained for two days.

On May 16, Michael Cochran, a supervisor of the Los Angeles Deferred Inspection Unit, memorialized in Sissoko's file a conversation he had with A. Watson of the East Los Angeles legalization office. His notes read:

> Telecon w/ A. Watson. Gives opportunity to obtain docs needed for presentation if we defer & that is what she feels is the best route - espec. after consideration of pending CSS Lawsuit and mandates that she has by memorandum.

> We'll give Def. Inspection until *afternoon* of June 06, 1997 = after CSS interview @ XLA.

Sissoko was released from detention on May 16, apparently to be given an opportunity to have an interview with the legalization office.

Sissoko married Julie Strommen on August 21 and filed an adjustment of status petition on August 26, based on his marriage. *See* 8 U.S.C. § 1255(a); *see also* 8 U.S.C. § 1154(a)(1)(A)(iii). On August 26, Pacita Pabilla, a legalization adjudicator, re-interviewed Sissoko at the East Los Angeles legalization office.[4] At the conclusion of the interview, Pabilla

---

[4]Pabilla testified that under INS policy, if the agency discovered that an alien had more than one legalization application with conflicting provisional class designations, the legalization office was to re-interview the alien and then consolidate the applications and assign one class designation to them.

informed Sissoko that he had not established *CSS* class membership.

That same day, Rocha placed Sissoko in detention, where he remained until November 17, 1997. When she took Sissoko into custody, Rocha again completed Form I-275, indicating once more that the "Basis for Action" was that Sissoko was "Ordered removed (inadmissible) by INS — Section 235(b)(1)." Rocha stated in her declaration that she took Sissoko into custody after learning from the East L.A. Legalization office that Sissoko's legalization applications had been denied. Pabilla testified, however, that she did not recall that anyone from Deferred Inspection ever called her to ask her for the results of Sissoko's interview, and that she had never spoken to Rocha, nor had she told anyone in her office that Sissoko was not eligible for legalization.

## 2.   Proceedings before the IJ and BIA

The INS elected to pursue ordinary removal proceedings, *see* 8 U.S.C. § 1229a, rather than expedited removal, *see* 8 U.S.C. § 1225(b)(1),[5] so Sissoko became eligible for release on bond, *see* 8 C.F.R. § 236.1(c), a release he obtained on November 17, 1997. In the removal proceedings, the INS contended that Sissoko was ineligible for adjustment of status based on his marriage, because he was an "arriving alien." *See* 8 C.F.R. § 245.1(c)(8) (deeming ineligible for adjustment of status "[a]ny arriving alien who is in removal proceedings pursuant to [8 U.S.C. § 1225(b)(1) or 8 U.S.C. § 1229a]").[6]

---

[5]Under 8 U.S.C. § 1225(b)(1), an arriving alien deemed inadmissible may be removed "without further hearing or review." Because Sissoko was instead placed in ordinary removal proceedings, he was entitled to a hearing regarding whether he should be removed and was entitled to certain other procedural protections. *See* 8 U.S.C. § 1229a.

[6]We cite to the 2000 version of the applicable regulation because it was the one in effect at the time the Immigration Judge issued his decision. The Interim Rule in effect at the time Sissoko filed his adjustment of sta-

In a 2000 decision, the Immigration Judge (IJ) concluded that the INA, pertinent regulations, and applicable case law, protect the pre-departure status of an alien who has a pending legalization application and obtains permission to travel abroad for a period of less than thirty days. *E.g.*, 8 U.S.C. § 1255; 8 C.F.R. § 245a.2(m)(1); *Navarro-Aispura v. INS*, 53 F.3d 233 (9th Cir. 1995). The IJ explained that 8 C.F.R. § 245a.2(m)(1) contemplates that an alien who obtains advance parole *would* be "*re*admitted," rather than treated as a newly-arriving alien applying for admission.[7] Also, Sissoko was not advised, the IJ noted, of the possibility that he might not be readmitted after his trip abroad. Given these circumstances, the IJ held, Sissoko was not an "arriving alien" but one who retained the status he had before he left. As Sissoko was in that status eligible for adjustment of status, *see* 8 C.F.R. § 245.1(a),[8] the IJ granted his application for adjustment of status.

---

tus petition contained identical language. *See* Interim Rule: Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10382 (Mar. 6, 1997) (deeming ineligible for adjustment of status "[a]ny arriving alien who is in removal proceedings pursuant to [8 U.S.C. § 1225(b)(1) or 8 U.S.C. § 1229a]") (effective April 1, 1997) (later codified at 8 C.F.R. § 245.1(c)(8)).

[7]The regulation read (and still reads) in pertinent part:

> During the time period from the date that an alien's application establishing prima facie eligibility for temporary resident status is reviewed at a Service Legalization Office and the date status as a temporary resident is granted, the alien applicant can only be readmitted to the United States provided his or her departure was authorized under the Service's advance parole provisions contained in § 212.5(e) [now § 212.5(f)] of this chapter.

8 C.F.R. § 245a.2(m)(1) (1997).

[8]In pertinent part, the regulation provides that:

> Any alien who is physically present in the United States, except for an alien who is ineligible to apply for adjustment of status under paragraph (b) or (c) of this section, may apply for adjustment of status to that of a lawful permanent resident of the United States if the applicant is eligible to receive an immigrant visa and an immigrant visa is immediately available at the time of filing of the application.

In March 2003, the BIA affirmed and adopted the decision of the IJ, stating:

> We agree with the Immigration Judge that the respondent should not be considered an arriving alien, ineligible for adjustment of status, based on his brief exit from the United States with advanced [sic] parole while his application for legalization was pending with the Immigration and Naturalization Service. *See Navarro-Aispura v. INS*, 53 F.3d 233 (9th Cir. 1995); *Matter of S-O-S-*, 22 I. & N. Dec. 107 (BIA 1998); 8 C.F.R. § 245a.2(m) (2002).

The BIA subsequently denied the INS's motion for reconsideration.

## B.   Procedural History

In January 2002, before the BIA issued its decision, the Sissokos brought suit against the United States, several federal agencies, and Rocha and other individual defendants, asserting a variety of claims. At issue in this appeal is solely the Sissokos' false arrest claim for money damages, alleging that Rocha wrongfully took Sissoko into custody on August 26, 1997, in violation of his Fourth Amendment rights. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).[9]

Rocha and the Sissokos cross-moved on this claim, Rocha seeking summary judgment as to qualified immunity and the Sissokos seeking summary adjudication as to the legality of the detention only. In July 2002, the district court denied Rocha's motion and granted the Sissokos' motion for summary adjudication on the merits. The court held that:

---

[9]Only the August detention is at issue in this appeal.

Because Mr. Sissoko had CSS membership status and an APD [advance parole document] when he returned from Senegal, he was not a newly-arriving alien and could not have been detained on that basis. Furthermore, because Mr. Sissoko had these documents, Defendant Rocha's justification of the detention on the ground that Mr. Sissoko was "not in possession of a . . . valid entry document" is unsupportable. Although Defendant Rocha stated in her original declaration that she "suspected fraud," neither she nor anyone else at the INS determined that Mr. Sissoko's CSS membership was void and that he could be detained as a result.

. . . [T]he Court finds, as a matter of law, that the August 1997 detention was improper. . . . [and that] Defendant Rocha is not entitled to qualified immunity. Because he was not a newly-arriving alien, Mr. Sissoko's right not to be detained was clearly established. Defendant Rocha's proffered reasons for arresting him are unsupportable; no reasonable INS officer would have detained Mr. Sissoko on those grounds.

(citations omitted).

Rocha then filed a Rule 59(e) motion for reconsideration, asserting for the first time that (1) 8 U.S.C. § 1252(g) bars the district court's jurisdiction over the sixth cause of action (the unlawful detention claim); and (2) a *Bivens* remedy is not available in immigration cases because, applying *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988), special factors counsel hesitation in recognizing a *Bivens* remedy. On the reconsideration motion, the district court held: (1) because the Sissokos' claim presented a challenge only to the manner in which Rocha's decision was carried out and not to ongoing immigration proceedings, the institution of removal proceedings, or an actual removal, jurisdiction is not barred by § 1252(g); and

(2) the question whether a *Bivens* remedy is available in this context was not a proper ground for a motion to reconsider, as it was a legal issue that could and should have been raised earlier.[10] The district court sua sponte certified its holdings for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), and we granted permission to appeal. Rocha separately filed a timely notice of appeal from the denial of qualified immunity pursuant to 28 U.S.C. § 1291. We consolidated the timely appeals.

## II.  SCOPE OF REVIEW

Before reaching the substantive questions presented, the nature of these interlocutory appeals warrants that we outline the precise issues that are — and are not — before us at this stage. The district court certified for appeal its rulings "on standing and the sixth claim for relief" in its initial decision. Thus, the district court certified its decision denying Rocha's motion for summary judgment on qualified immunity and its decision granting the Sissokos' motion for summary adjudication on the unlawfulness of Sissoko's detention. The district court later certified its ruling on the denial of Rocha's Rule 59(e) motion. The district court therefore also certified its holding that § 1252(g) does not bar jurisdiction over the Sissokos' claims, and that it need not consider Rocha's argument against inferring a *Bivens* remedy because that was a legal argument first raised on reconsideration. "Our jurisdiction under § 1292(b) . . . is not limited to deciding the precise question the district court certified to us. Rather, we are reviewing the district court's order . . . , and may address any issue fairly included within that order." *Lee v. Am. Nat'l Ins. Co.*, 260 F.3d 997, 1000 (9th Cir. 2001) (citing *Yamaha Motor Corp., USA v. Calhoun*, 516 U.S. 199, 205 (1996)).

---

[10]On the *Bivens* point, the district court also noted that "holding that aliens have no *Bivens* remedy against immigration officers for violations of their rights could well create a constitutional problem." The district court did not, however, conclude affirmatively that a *Bivens* remedy *is* available, but left the issue undecided.

Before reaching the district court's denial of Rocha's motion for summary judgment or its grant of summary adjudication to Sissoko, we must, of course, address Rocha's jurisdictional arguments. *See, e.g.*, *Wong v. U.S. INS*, 373 F.3d 952, 960-61 (9th Cir. 2004) (sustaining appellate jurisdiction in qualified immunity appeal over questions of subject-matter jurisdiction). What is less clear is whether we should — and whether we *can* — address whether a *Bivens* remedy is implicitly precluded by the INA.

**[1]** As we have repeatedly held, "Rule 59(e) amendments are appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *Dixon v. Wallowa County*, 336 F.3d 1013, 1022 (9th Cir. 2003) (internal quotation marks omitted). "We review the denial of a motion for reconsideration for abuse of discretion." *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1100 (9th Cir.) (citation omitted), *cert. denied*, 125 S. Ct. 106 (2004).

**[2]** The district court did not abuse its discretion in concluding that Rocha's Rule 59(e) motion raising the *Bivens* issue for the first time satisfied none of the pertinent conditions. The underlying decision did not decide whether a *Bivens* remedy is precluded by the INA, and so could not have erred in that regard. Further, the district court affirmatively decided only the legality of Sissoko's detention; it granted no relief to the Sissokos, and so did not implicitly decide the *Bivens*/*Schweiker* issue either. Nor must we reach this issue sua sponte, because the existence of a *Bivens* remedy is not jurisdictional. *See Wong*, 373 F.3d at 961 (resolving whether there is a *Bivens* remedy is "not a logical predicate to the resolution of [qualified immunity]"); *see also Neb. Beef, Ltd. v. Greening*, 398 F.3d 1080, 1082-84 (8th Cir. 2005).

There will necessarily be further proceedings in the district court after this interlocutory appeal. We therefore leave to the

district court in the first instance any arguments the parties may choose to make concerning whether a *Bivens* remedy is precluded under *Schweiker. See, e.g.*, *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 403 F.3d 683, 691 & n.9 (9th Cir. 2005).

Even if we were inclined to reach the *Bivens*/*Schweiker* issue at this stage, our interlocutory appellate jurisdiction does not extend to the merits of this issue. The merits question was not certified by the district court, presumably because it was not decided. Rather, the only pertinent issue certified was the propriety of the district court's refusal to decide the *Bivens* issue on the motion to reconsider. *Cf. Wong*, 373 F.3d at 961 (holding that there is no jurisdiction in an interlocutory qualified immunity appeal under 28 U.S.C. § 1291 to review the district court's decision to infer a *Bivens* remedy).

Having determined one certified question — that the district court properly denied the Rule 59(e) motion with regard to the newly-raised legal issue concerning *Bivens* — we must now decide (1) whether the district court had subject-matter jurisdiction to consider the Sissokos' claims; (2) whether Sissoko's constitutional rights were violated; and (3) whether on the present record Rocha is entitled to qualified immunity.[11] We address these issues in turn.

---

[11]Appellate review under 28 U.S.C. § 1291 of the denial of qualified immunity is usually limited to issues of law. *See Johnson v. Jones*, 515 U.S. 304, 313-18 (1995); *Wilkins v. City of Oakland*, 350 F.3d 949, 951 (9th Cir. 2003). In such an appeal, "[w]here disputed facts exist, we will determine if the denial of qualified immunity was proper by assuming that the version of events offered by the nonmoving party is correct." *Wilkins*, 350 F.3d at 951; *see also Prison Legal News v. Lehman*, 397 F.3d 692, 697 (9th Cir. 2005). Given that standard, we see no material difference to our qualified immunity analysis between the jurisdiction conferred upon us by § 1291 and that conferred by § 1292(b), and consider both appeals together.

## III. SUBJECT-MATTER JURISDICTION

The first question we must address is whether, as Rocha argues, the jurisdiction-stripping provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), codified at 8 U.S.C. § 1252,[12] deprived the district court of subject-matter jurisdiction over this action. As we have reiterated, "[e]very federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review.' " *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 687 (9th Cir. 2003) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (citation omitted)); *see also Wong*, 373 F.3d at 960-61 (highlighting the need to address jurisdictional issues in qualified immunity appeals).

As is often the case in IIRIRA-related appeals, however, this threshold inquiry requires us to "untie the various jurisdictional Gordian knots created by [IIRIRA]," *Baeta v. Sonchik*, 273 F.3d 1261, 1263 (9th Cir. 2001), a task that, in this case, requires considerable attention to some unusual circumstances. Further complicating our analysis are the amendments to § 1252 recently enacted in the REAL ID Act of 2005, Pub. L. No. 109-13, div. B, § 106, 119 Stat. 231, 310-11, which revised the two provisions central to our jurisdictional inquiry — § 1252(g), dealing with challenges to certain actions of the Attorney General, and § 1252(a)(2)(A), dealing specifically with expedited removal.[13]

---

[12]All further references to the U.S. Code are to Title 8 unless otherwise noted.

[13]The REAL ID Act of 2005 was signed into law on May 11, 2005. As relevant here, the statute provides that the amendments to § 1252 "shall take effect upon the date of the enactment of this division and shall apply to cases in which the final administrative order of removal, deportation, or exclusion was issued before, on, or after the date of the enactment of this division." REAL ID Act of 2005 § 106(b), 119 Stat. at 311. The parties have not had an opportunity to submit briefing as to whether the REAL ID Act should factor into our decision. We nonetheless can assume that the amendments to § 1252 *do* apply, as they ultimately do not alter our analysis.

## A.  Section 1252(g)

As amended by the REAL ID Act, § 1252(g) reads as here relevant:

> Exclusive Jurisdiction. — Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act.

8 U.S.C. § 1252(g).[14]

[3] *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) (*AADC*), considered the effect of § 1252(g) (before the REAL ID Act amendments, of course) on a court's ability to hear a First Amendment selective prosecution claim. Section 1252(g), the Supreme Court explained, does not bar all judicial review involving deportation cases. Instead, the provision "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders." *Id.* at 482; *see also CSS*, 232 F.3d at 1150 (holding that § 1252(g) does not bar "all claims relating in any way to deportation proceedings"). *AADC* further explained that "[t]here are of course many other decisions or

---

[14]Section 106(a)(3) of the REAL ID Act added "(statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title" after "notwithstanding any other provision of law." REAL ID Act of 2005 § 106(a)(3), 119 Stat. at 311.

actions that may be part of the deportation process — such as the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final [deportation] order . . . , and to refuse reconsideration of that order." 525 U.S. at 482. Since *AADC*, we have heeded the Supreme Court's directive and construed § 1252(g) so as to apply only to those aspects of the deportation process *specifically* referred to in the statutory language. *See Wong*, 373 F.3d at 963-64 (citing cases); *United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (en banc).

[4] No removal order was ever "execute[d]" with respect to Sissoko, nor does the lawsuit seek to prevent the prospective execution of a removal order at some point in the future.[15] Section 1252(g), consequently, would preclude jurisdiction only if the Sissokos' claim — that Rocha unlawfully arrested Sissoko and placed him in detention — amounted to a challenge of Rocha's decision to "commence proceedings" against Sissoko or to "adjudicate" his case.

[5] Even if expedited removal is a "proceeding," a question we do not decide, § 1252(g) only bars review of issues arising from decisions to *commence* such proceedings; it does not serve as an outright bar to any litigation related to such proceedings. *See AADC*, 525 U.S. at 482-88. This linguistic emphasis on the decision to *begin* removal proceedings reflects Congress's underlying concerns in enacting § 1252(g). As Justice Scalia recounted in tracing the lineage of the provision,

> There was good reason for Congress to focus special attention upon, and make special provision for, judicial review of the Attorney General's discrete acts of "commenc[ing] proceedings, adjudicat[ing]

---

[15]Whether such a claim for prospective relief would be barred by § 1252(g) is a question we do not reach today.

cases, [and] execut[ing] removal orders" — which represent the initiation or prosecution of various stages in the deportation process. At each stage the Executive has discretion to abandon the endeavor, and at the time IIRIRA was enacted the INS had been engaging in a regular practice (which had come to be known as "deferred action") of exercising that discretion for humanitarian reasons or simply for its own convenience.

*AADC*, 525 U.S. at 483-84 (alterations in original). Thus, "[§] 1252(g) was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion. It does not tax the imagination to understand why it focuses upon the stages of administration where those attempts have occurred." *Id.* at 485 n.9.

**[6]** Rocha contends that we lack jurisdiction pursuant to § 1252(g) because Sissoko's detention arose from her decision to commence expedited removal proceedings.[16] In interpreting § 1252(g), we are guided by the general approach adopted in *Humphries v. Various Federal USINS Employees*, 164 F.3d 936 (5th Cir. 1999). *Humphries* held that an alien's claim for mistreatment while in detention fell outside the scope of the "arising from" language in § 1252(g). *Id.* at 944.[17] Although the majority and dissent disagreed over the availability of *Bivens* actions under the INA,[18] there was no dis-

---

[16]Sissoko was not detained as a consequence of his eventual *regular* removal proceedings, as the government does not contend, and there is no evidence that, the Attorney General ever issued the warrant required under 8 U.S.C. § 1226(a) for detention of non-criminal aliens in regular removal proceedings.

[17]*Humphries* also held that § 1252(g) *does* preclude jurisdiction over an alien's *Bivens* claim for retaliatory exclusion. *See* 164 F.3d at 945; *see also Foster v. Townsley*, 243 F.3d 210, 214-15 (5th Cir. 2001) (holding that jurisdiction over an alien's *Bivens* claims of excessive force, denial of due process, and denial of equal protection in the execution of his deportation order was precluded by § 1252(g)).

[18]We emphasize, once more, that we are not reaching the question whether a *Bivens* action is available under the INA, and are therefore not

agreement that, "whatever the precise contours of 'arising from' as that phrase is used in § 1252(g), it does not encompass a connection so remote as having been placed in a situation in which certain third parties subsequently cause an alleged injury." *Id.*

**[7]** In both *Humphries* and *Foster v. Townsley*, 243 F.3d 210, 214-15 (5th Cir. 2001), the precluded claims directly concerned agency decisions formally to commence removal proceedings and/or execute removal orders, falling well within the plain language of § 1252(g). *See, e.g.*, *Foster*, 243 F.3d at 214 ("The particular acts that form the basis of Foster's lawsuit arise from the officials' decision to execute his removal order."); *Humphries*, 164 F.3d at 945 (holding that Humphries' claim for retaliatory exclusion was precluded because "the Attorney General's decision to place Humphries in exclusion proceedings appears to provide the most direct, immediate, and recognizable cause of Humphries' injury"). Consistent with *AADC* and the Fifth Circuit's approach, we conclude that the Sissokos' case is not based on an injury claimed to result from a decision formally to commence removal proceedings, as no such proceedings were ever commenced. Whereas in *Humphries*, the abuse that occurred in detention was too far removed from the discrete events covered by § 1252(g) to trigger its jurisdictional bar, in this case none of the three events ever took place.

The Sissokos' detention claim is best understood by outlining what happened as a three-stage sequence following the initial inspector's decision at Dulles airport to parole Sissoko into the country:

taking sides between the majority and the dissent in *Humphries* as to that issue. All we hold today is that the Sissokos' claims fall outside the boundaries of the 'arising from' barrier in § 1252(g), and that § 1252(g) therefore does not bar a *Bivens* action (or any other, for that matter), arising out of such claims. *See, e.g.*, *Wong*, 373 F.3d at 966.

1. Sissoko's parole is terminated and he is "restored to the status that he . . . had at the time of parole." 8 C.F.R. § 212.5(e)(2)(i). At this juncture, as outlined in the INS's June 30, 1997 "Policy Concerning pre-April 1, 1997 Parolees," Sissoko was eligible only for regular removal proceedings, not expedited removal: "If it is necessary to terminate parole [from June 30, 1997 until the amendment of 8 C.F.R. § 1.1(q) on April 20, 1998], the alien should not be placed in expedited removal."

2. Rocha, according to her declaration, determines that Sissoko's "status . . . at the time of parole," 8 C.F.R. § 212.5(e)(2)(i), was "that he lacked any legal status." As a result, she checked with a superior and "I took Mr. Sissoko into custody." Rocha does *not* state in her declaration that Sissoko was placed in expedited removal proceedings. Only in her briefs does she maintain that it was reasonable for her to conclude that Sissoko was an arriving alien subject to expedited removal, despite his advance parole document and prior lawful temporary resident status.

3. Rocha issues Sissoko a "Withdrawal of Application for Admission" form, checking under "Basis for Action" the "Application for Admission Withdrawn" box and another box stating "Ordered Removed (inadmissible) by INS — Section 235(b)(1) (order attached)," referring to a non-existent expedited removal order. She then detains him.

Rocha contends that during this course of events she decided to commence expedited removal proceedings against Sissoko, thereby bringing herself under the protection of § 1252(g). In fact, however, the record nowhere supports the proposition that any such proceedings were commenced. As noted, *no expedited removal order was ever issued.* Nor was Sissoko given a letter stating that he was being placed in expedited removal proceedings, although he had been given such a letter regarding the May detention. No immigration officer completed a required expedited removal "[r]ecord of

proceeding . . . questioning and recording . . . the alien's statement regarding . . . inadmissibility." 8 C.F.R. § 235.3(b)(2).

Instead, Rocha checked a second box on the form in August, in addition to that referring to the phantom expedited removal order, one not checked in May: "Application for Admission Withdrawn." 8 C.F.R. § 235.4 states that:

> The Attorney General may, in his or her discretion, permit any alien applicant for admission to withdraw his or her application for admission *in lieu of* removal proceedings under section 240 of the Act or expedited removal under section 235(b)(1) of the Act. . . . An alien permitted to withdraw his or her application for admission *shall normally remain in carrier or Service custody pending departure*, unless the district director determines that parole of the alien is warranted in accordance with § 212.5(b) of this chapter.

(Emphasis added). The regulation just quoted derives from 8 U.S.C. § 1225(a)(4): "An alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States."

In the absence of an expedited removal order, the most plausible reading of the record is that Rocha applied this provision granting permission to withdraw an application for admission to Sissoko in lieu of commencing expedited removal proceedings, just as administrative voluntary departure can be applied to aliens in lieu of issuing the Notice to Appear that commences regular removal proceedings. *See* 8 U.S.C. § 1229c(a)(1); 8 C.F.R. § 240.25. Yet, there is no evidence in the record that Sissoko intended to "withdraw [an] application for admission," and he certainly did not intend to "depart immediately from the United States." Thus, Rocha's representation of the basis for the detention was false on two

counts: There was no removal order; and there was no withdrawal of an application for admission.

In *Kwai Fun Wong*, we relied on *AADC* to conclude that "actions that occurred *prior* to any decision to 'commence proceedings,' if any . . . such as the INS officials' allegedly discriminatory decisions regarding . . . revocation of parole" are not subject to § 1252(g)'s jurisdictional bar. *See* 373 F.3d at 965. Here, the Sissokos claim Rocha's determination that Sissoko was an arriving alien despite his advance parole document, a determination that was *not* followed by "commencement of proceedings," violated his right to be free from the ensuing detention. Our exercise of jurisdiction therefore does not implicate the bar contained in § 1252(g).

**[8]** Nor is there any tenable argument, in our view, that the decision to detain Sissoko was the "adjudicat[ion]" of his case. Although that term is not defined in the case law, the term "adjudicate" in ordinary parlance refers to a formal decisional process, in this case, a process to consider whether to grant or deny specific relief requested by an alien or the INS. So understood, "adjudication" does not include a purely administrative decision to detain an allegedly arriving alien, without any hearing at all. We therefore conclude that § 1252(g) does not preclude the Sissokos' claims.

Their claims may nonetheless be barred by § 1252(a)(2)(A), the provision to which we now turn.

**B.   Section 1252(a)(2)(A)**

**[9]** Section 1252(a)(2) sets forth "Matters not subject to judicial review." As amended by the REAL ID Act, § 1252(a)(2)(A) reads in relevant part:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus

provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to review—

> (i)     except as provided in subsection (e), any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 235(b)(1) [8 U.S.C. § 1225(b)(1), setting forth procedures for expedited removal],
>
> (ii)    except as provided in subsection (e), a decision by the Attorney General to invoke the provisions of such section,
>
> (iii)   the application of such section to individual aliens . . . .

8 U.S.C. § 1252(a)(2)(A).[19]

In *Wong*, we expressly reserved "whether § 1252(a)(2)(A)'s restrictions on 'jurisdiction to review' appl[y] only to petitions for review of decisions of the [BIA], and not to *Bivens* claims." 373 F.3d at 965 n.17. Although we again have no need to decide this issue for reasons we shortly explain, resolving the question left open in *Wong* could now involve consideration of new § 1252(a)(5), which provides that:

> For purposes of this chapter, in every provision that limits or eliminates judicial review or jurisdiction to review, the terms "judicial review" and "jurisdiction

---

[19]As with § 1252(g), the language added to § 1252(a)(2)(A) by the REAL ID Act is: "(statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title," following "[n]otwithstanding any other provision of law." *See* REAL ID Act of 2005 § 106(a)(1)(A)(i), 119 Stat. at 310; *see also ante* at 2703-04 nn.13-14.

to review" include habeas corpus review pursuant to section 2241 of title 28, United States Code, or any other habeas corpus provision, sections 1361 and 1651 of such title, and review pursuant to any other provision of law (statutory or nonstatutory).

REAL ID Act of 2005 § 106(a)(1)(B), 119 Stat. at 311. Even as amended, however, § 1252(a)(2)(A) is a bar only to claims arising out of removal orders. As it turns out that there is no removal order here, § 1252(a)(2)(A) does not apply, and the language of § 1252(a)(5) is therefore not implicated.

We have had occasion to consider the meaning of § 1252(a)(2)(A) in only two cases, neither of which provide extensive guidance. In *Montero-Martinez v. Ashcroft*, 277 F.3d 1137 (9th Cir. 2002), we observed that § 1252(a)(2)(A)(i) provides an example of the kind of language Congress would use when it "unequivocally and unambiguously" means to "strip jurisdiction over all matters relating to an immigration order or decision." *Id.* at 1143; *see also Avendano-Ramirez v. Ashcroft*, 365 F.3d 813, 818 (9th Cir. 2004) (stating that the characterization in *Montero-Martinez* of the language of § 1252(a)(2)(A) is "an accurate" one).

In *Avendano-Ramirez*, we considered whether § 1252(a)(2)(A)(i) barred jurisdiction over an alien's claim, brought in a removal proceeding, that her prior expedited removal under § 1225(b)(1)(A)(i) was improper and therefore should not preclude a finding that she was a person of good moral character. 365 F.3d at 816-17 (explaining that under § 1101(f)(3) and § 1182(a)(9)(A), an alien cannot be considered to be of "good moral character" if she is " 'an alien who has been ordered removed under section 1225(b)(1) of this title . . . and who again seeks admission from within 5 years of the date of such removal' " (quoting § 1182(a)(9)(A))). We concluded that jurisdiction over Avendano-Ramirez's challenge to her prior expedited removal order was precluded, because in that case "we [were] asked to perform a direct appeal review of a claim

'arising from or relating to the implementation . . . of an order of removal pursuant to section 1225(b)(1).' " *Id.* at 818 (quoting § 1252(a)(2)(A)(i)). *Avendano-Ramirez* further explained:

> It is true that in this instance the attack on the earlier order itself is collateral in nature, but our review would necessarily involve entertaining a claim arising from the removal order because we would be asked to nullify the continuing effects of that order.

*Id.*

[10] *Avendano-Ramirez* thus stressed that a central focus of § 1252(a)(2)(A) is preventing courts from "nullify[ing] the continuing effects of [an expedited removal] order." Section 1252(a)(2)(A) is quite particular about this focus, specifying that it pertains to "the implementation or operation of *an order of removal.*" 8 U.S.C.§ 1252(a)(2)(A)(i) (emphasis added). It is the absence of such an order in this case that defeats § 1252(a)(2)(A)(i)'s jurisdictional bar.[20]

Rocha acknowledged at oral argument that the record on appeal in this case does not contain an order of removal.[21] At the time Sissoko was taken into custody, an immigration officer in Rocha's position was required to document an expedited removal order on Form I-860. *See* Interim Rule, *supra* note 6, 62 Fed. Reg. at 10355-56 ("The examining immigration officer shall advise the alien of the charges against him

---

[20]A second point *Avendano-Ramirez* mentioned regarding the application of § 1252(a)(2)(A) — that the provision's use of the term of art "jurisdiction to review" indicates that it was meant to be most pertinent with respect to cases on direct appeal from the BIA — is of questionable relevance where the REAL ID Act applies. The other principle, however — that the focus of the provision is on preserving the effects of a removal order — remains fully applicable in light of the new statute.

[21]The Sissokos' attorney represented during oral argument that based on his review of the materials turned over by the INS through discovery and Freedom of Information Act requests, "[t]here was never an order."

or her on Form I-860, Notice and Order of Expedited Removal . . . .") (effective Apr. 1, 1997) (later codified at 8 C.F.R. § 235.3(b)(2)(i)).

No Form I-860 is included in the record. The only references to a removal order in the record are the two different versions of Form I-275 ("Withdrawal of Application for Admission") completed by Rocha on May 15 and August 26, 1997. On each form, Rocha checked a box indicating (in pre-printed text) that the "Basis for Action" was that Sissoko was "Ordered removed (inadmissible) by INS — Section 235(b)(1) (order attached)." To neither form, however, was such an order attached, as far as the record reveals.

There is no other evidence in the record, either, indicating that an order of removal was issued. For example, Rocha's declaration omits mention of a removal order, stating instead that:

> On August 26, 1997, Mr. Sissoko reported to Deferred Inspection following Mr. Sissoko's interview at the Legalization Office, and the filing of a petition to adjust Sissoko's status to that of a lawful resident. Having been informed by the Legalization office that Mr. Sissoko was not a prima facie CSS [class] member, I knew that he lacked any legal status. After receiving telephone concurrence from a superior, Ms. Johnson, I took Mr. Sissoko into custody.

Similarly, the letter to Sissoko informing him that his parole was being revoked states that his parole "is revoked concurrent with your placement into Expedited Removal," making no mention of the issuance of an expedited removal order. The INS's chronology of events,[22] introduced by Sissoko in the district court, also omits mention of any removal order:

---

[22]The timeline was part of an internal INS memorandum prepared on September 18, 1997, by Rosemary Melville, Deputy District Director for the Los Angeles District, for Carolyn Muzyka, the then-Acting Deputy Regional Director for the Western Region.

08-27-97 Sissoko presents himself to complete inspection; received telephonic confirmation from Legalization Office Sissoko's not prima facie eligible for benefits. Sissoko taken into custody and expedited removal proceedings reinstated.

**[11]** The question, then, is how the absence of any removal order in the record affects our jurisdiction. In general, the burden is on the party asserting jurisdiction to prove that jurisdiction exists. *See, e.g.*, *Miguel v. Country Funding Corp.*, 309 F.3d 1161, 1164 (9th Cir. 2002) ("The party asserting federal jurisdiction has the burden of establishing it." (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994))); *La Reunion Française SA v. Barnes*, 247 F.3d 1022, 1025-26 & n.2 (9th Cir. 2001). Sissoko's complaint asserted jurisdiction pursuant to 28 U.S.C. § 1331. Rocha urges that the federal courts are stripped of jurisdiction by 8 U.S.C. § 1252. We have not previously indicated where the burden of production lies in a situation such as the instant one, in which one party asserts subject-matter jurisdiction pursuant to a general jurisdictional statute and the other party contends that jurisdiction is removed by another specific statute.[23]

As we described some time ago:

> The "burden" in a civil case involves not one but *two* elements: the burden of going forward with

---

[23]In the context of § 1252(a)(2)(C), precluding jurisdiction to review final orders of removal against certain criminal aliens, we have indicated that the jurisdictional question merges with the merits, and that it is the government's burden to prove by clear and convincing evidence that the alien has been convicted of a covered offense. *See, e.g.*, *Noriega-Lopez v. Ashcroft*, 335 F.3d 874, 877-79 (9th Cir. 2003) (citing *Sareang Ye v. INS*, 214 F.3d 1128, 1131 (9th Cir. 2000)). The basis for that holding, however, appears to be the statutory provision placing the burden of proof on the merits of a removal decision on the government, *see* 8 U.S.C. § 1229a(c)(3)(A), obviating the need to address the burden of proof applicable where there is no such merger of jurisdictional and merits issues.

> proof (the burden of "production") and the burden of persuading the trier of fact (the burden of "proof"). J. Weinstein & M.A. Berger, *Weinstein's Evidence* ¶ 300(01), at 300-2-3 (1985) [hereinafter *Weinstein's*]; E. Cleary, *McCormick on Evidence*, § 336, at 947 (3d ed. 1984) (citing authorities). A presumption which shifts the burden of *production* has the sole effect of forcing the opponent of the presumption to produce enough evidence to avoid a directed verdict. *Id. See also Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 n.8 (1981) (involving Title VII case); *Lowe v. City of Monrovia*, 775 F.2d 998, 1006 n.5 (9th Cir. 1985) (same). A presumption which shifts the burden of proof, in contrast, requires the opponent of the presumption to prove or disprove the existence of the disputed fact. *Weinstein's*, *supra* ¶ 300(01), at 300-2-3.

*Lew v. Moss*, 797 F.2d 747, 751 (9th Cir. 1986); *see also Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267, 272-76 (1994). Here, we are immediately concerned only with the burden of production, for the problem is the absence of *any* evidence concerning the existence of a removal order.

Placing this burden on Sissoko would require that he prove a negative fact — that the INS never issued an expedited removal order pertaining to him. "[A]s a practical matter it is never easy to prove a negative." *Elkins v. United States*, 364 U.S. 206, 218 (1960). For this reason, fairness and common sense often counsel against requiring a party to prove a negative fact, and favor, instead, placing the burden of coming forward with evidence on the party with superior access to the affirmative information.

In *Flores v. United States*, 551 F.2d 1169 (9th Cir. 1977), for example, we placed the burden of production on the government with regard to affirmative proof of an individual's

ownership interest in a property subject to levy, rather than requiring the taxpayer to "prove a negative fact about which he has absolutely no information." *Id.* at 1175-76. Similarly, in *Lew*, we shifted the burden of production to the defendant, who alleged that there was no subject-matter jurisdiction under 28 U.S.C. § 1332 because he was no longer domiciled in California (and was instead domiciled in Hong Kong) at the time of the suit. *See* 797 F.2d at 751-55.

**[12]** In both cases, in other words, we shifted the burden of production to the party arguing against jurisdiction when it was in a superior position with respect to the relevant facts. It has become commonplace in other contexts as well to allocate the burden of proving that a jurisdictionally-dispositive document does or does not exist to the party in possession of potential proof, often *not* the plaintiff. *See, e.g.*, *Brush v. Office of Pers. Mgmt.* (*OPM*), 982 F.2d 1554, 1560-61 (Fed. Cir. 1992) (holding that the burden was on the OPM to produce a copy of a notice required by statute). These considerations suggest that, because Rocha is in a unique position to know whether a removal order was in fact issued, she should be required to come forward with affirmative evidence that an expedited removal order was issued with respect to Sissoko.

**[13]** In this case, Rocha has failed to meet this burden. As we explained above, both the order of removal itself and references to the actual existence of any order of removal are conspicuously absent from the record. Because there is no removal order in this case,[24] our review of the Sissokos' claim

---

[24]Were there an order in this case, there may be an argument that the IJ's decision finding Sissoko entitled to readmission rendered Rocha's decisions — including any such removal order — a legal nullity, and therefore no bar to jurisdiction. Whether we would retain jurisdiction in that instance is a more complicated inquiry, and one we need not undertake here. *Cf. Molina-Camacho v. Ashcroft*, 393 F.3d 937, 942 (9th Cir. 2004) ("Because the BIA chose not to remand to the IJ for the issuance of the order, no final order of removal exists in this case that would provide jurisdiction for this court under § 1252. . . . [T]he BIA's order is a legal nullity . . . .").

does not pose a risk of "nullify[ing] the continuing effects of" any expedited removal order. *Avendano-Ramirez*, 365 F.3d at 818. Nor does it make sense to speak of a claim as "arising from or relating to the implementation or operation of an order of removal" that does not exist. Under these circumstances, Rocha's contention that 8 U.S.C. § 1252(a)(2)(A)(i) precludes jurisdiction in this case because the case concerns a "cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 235(b)(1)" must fail.[25]

Section 1252(e)(3), which is titled "Challenges on validity of the system," and provides for special "judicial review" of certain systemic constitutional claims, does not suggest a different result. That provision reads in pertinent part:

> Judicial review of determinations under section 235(b) and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of —
>
>> (i)     whether such section, or any regulation issued to implement such section, is constitutional; or

---

[25]Whether § 1252(a)(2)(A)(i), read together with § 1252(a)(5), necessarily precludes damages claims when there *is* a final order of removal may be informed by another provision of § 1252, § 1252(e)(1)(A), which bars courts from "enter[ing] declaratory, injunctive, or other *equitable* relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title." (emphasis added). The careful limitation of this provision to equitable relief may indicate an intention to allow some damages actions to go forward. *See, e.g.*, *Munyua v. United States*, No. C-03-04538, 2005 WL 43960 (N.D. Cal. Jan. 10, 2005) (sustaining a negligence claim for damages under the Federal Tort Claims Act brought by an alien alleging that she was wrongfully denied asylum and removed to Kenya).

> (ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this title or is otherwise in violation of law.

8 U.S.C. § 1252(e)(3)(A).[26]

The introductory provision to § 1252(e) indicates that the section is limited to "declaratory, injunctive, or other equitable relief," and class actions. *See* 8 U.S.C. § 1252(e)(1). It does not appear to be directed at damages actions.

Moreover, § 1252(e)(3), in particular, is headed "[c]hallenges on [sic] validity of the system," and concerns review of the constitutionality of § 1225(b) and the constitutional and statutory validity of "any regulation . . . written policy directive, written policy guideline, or written procedure . . . to implement such section." 8 U.S.C. § 1252(e)(3)(A)(ii). It does not cover damages claims concerning discrete actions of INS officials applying the statute and applicable regulations and policies.[27]

**[14]** Section 1252(e)(3), consequently, is of no pertinence to our jurisdiction here. We therefore conclude that the

---

[26]Unlike the other provisions discussed above, § 1252(e) was not altered by the REAL ID Act of 2005.

[27]It bears emphasizing, in addition, that the Sissokos' suit does not seek to overturn or modify any decision of the agency, but rather to recover monetary compensation for the allegedly unconstitutional actions of an individual officer — actions which, in the unusual circumstances of this case, the agency itself has already deemed wrongful. If anything, the Sissokos are *accepting* the BIA's own determination — holding Rocha's actions invalid — and using the agency's final decision as grounds for their *Bivens* claim.

restrictions in § 1252 are not applicable to the Sissokos'
*Bivens* claims, and that the district court properly exercised
jurisdiction over this case.

## IV.   QUALIFIED IMMUNITY

Having held that § 1252 does not deprive us of jurisdiction
over the Sissokos' *Bivens* action, we turn to the merits of this
interlocutory appeal. In brief: The Sissokos maintain that the
detention that began in August 1997 violated Oumar Sis-
soko's Fourth Amendment rights. Rocha contends, in con-
trast, that she is entitled to qualified immunity from any
damages liability. We focus on Rocha's defense, as deciding
it determines the merits of the Sissokos' claimed constitu-
tional violation.

To resolve the qualified immunity question, we must
undertake two inquiries: (1) whether, "[t]aken in the light
most favorable to the party asserting the injury, . . . the facts
alleged show the officer's conduct violated a constitutional
right"; and, if a violation of a constitutional right could indeed
be found, (2) "whether the right was clearly established." *Sau-
cier v. Katz*, 533 U.S. 194, 201 (2001). We review the district
court's qualified immunity determination de novo. *See Elder
v. Holloway*, 510 U.S. 510, 516 (1994); *Sorrels v. McKee*, 290
F.3d 965, 969 (9th Cir. 2002).

### A.   Constitutional Violation

[15] The authority of INS agents to interrogate or arrest an
alien, even where specifically authorized by statute, is limited
by the strictures of the Fourth Amendment. *See Zepeda v.
U.S. INS*, 753 F.2d 719, 725-26 (9th Cir. 1985) (citing *Babula
v. INS*, 665 F.2d 293 (3d Cir. 1981)); *see also Orhorhaghe v.
INS*, 38 F.3d 488, 497-501 (9th Cir. 1994) (holding that INS
investigators violated an alien's Fourth Amendment rights by
detaining him for questioning about his immigration status
and by conducting a warrantless search of his home without

having obtained voluntary consent). Here, Rocha does not argue that Sissoko *was* an "arriving" alien, so it was proper to place him in custody. Instead, Rocha challenges only whether detaining Sissoko violated the Fourth Amendment, maintaining that there was *some* basis for detaining him, or, at least, that she reasonably could have so believed *at that time*.

**[16]** Indeed, the IJ and BIA held that Sissoko was *not* an arriving alien, as defined by the INA, applicable regulations, and our case law.[28] Most relevant here is our decision in *Navarro-Aispura*, 53 F.3d 233, in which we held that an alien who received advance parole to leave the country while his legalization[29] application was pending remained entitled to deportation proceedings, rather than exclusion proceedings, once that application was denied. *See id*. at 235; *see also Patel v. Landon*, 739 F.2d 1455 (9th Cir. 1984). The IJ and the BIA each read *Navarro-Aispura* for the slightly more general proposition that an advance parole document serves to preserve an alien's status as of the moment he departs the

---

[28]Even if Rocha had sought to re-litigate the issue of whether Sissoko was an arriving alien, we would be obliged to accord *Chevron* deference to — and in any event do not disagree with — the BIA's legal conclusion that individuals in Sissoko's circumstances are not arriving aliens, as the legal question "implicates the 'agency's construction of the statute [that] it administers.' " *Hernandez-Guadarrama v. Ashcroft*, 394 F.3d 674, 678 (9th Cir. 2005) (quoting *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999)); *see also Lagandaon v. Ashcroft*, 383 F.3d 983, 987 (9th Cir. 2004).

[29]More precisely, the application at issue in *Navarro-Aispura* was an application for "registry," pursuant to 8 U.S.C. § 1259, which (still) "provides for amnesty and permanent residency status for aliens who entered the United States prior to 1972, have resided continuously in the United States since entry, are of good moral character, and are not otherwise ineligible for citizenship." *Navarro-Aispura*, 53 F.3d at 234. There is, however, no cognizable difference of which we are aware for present purposes between the "registry" process involved in *Navarro-Aispura* and the legalization process in which Sissoko was involved. The IJ and BIA saw none either, as they relied on *Navarro-Aispura*.

country, *see, e.g.*, *Barney v. Rogers*, 83 F.3d 318 (9th Cir. 1996) (holding that an alien subject to exclusion at the time he received his advance parole document remained subject to exclusion on returning to the United States); *see also* 8 C.F.R. § 212.5(e)(2)(i), and that an alien who has an advance parole document and is in legalization proceedings is therefore *not* an "arriving alien" upon return. The point of *Navarro-Aispura* is subtle, yet critical: The denial of an alien's legalization application after he returns with a valid advance parole document leaves him in the status he was in prior to his application, and does *not* foreordain his removal.

The remaining substance of this appeal therefore devolves into two questions: Given the IJ's and BIA's legal determination (and our then-extant case law) that Sissoko was not an arriving alien upon his return to the United States, did Rocha's decision to detain him violate the Fourth Amendment? If so, were the rights that were violated clearly established?

**[17]** There is no doubt that Rocha took Sissoko into custody pursuant to the authority of the expedited removal statute, § 1225, not any other provision of the INA. That section provides that "[i]f an immigration officer determines that an alien . . . who is arriving in the United States . . . is inadmissible under section [8 U.S.C. § 1182(a)(6)(C) or (a)(7)], the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." In other words, only if Sissoko was an arriving alien inadmissible under § 1182(a)(6)(C) or § 1182(a)(7) was the detention valid.[30]

---

[30]We note an incongruity between the expedited removal statute, which only expressly contemplates mandatory detention for *asylum applicants* pending a credible fear determination, and the applicable regulation, which provides that:

Under § 1182(a)(7), any immigrant who is not in possession of "a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document . . . is excludable." But the record establishes — and Rocha does not meaningfully contest — not only that Sissoko *had* a valid entry document, but that Rocha should have known about it.

**[18]** Sissoko presented his Form I-512 (the advance parole document) to the immigration officer at Dulles, who noted the existence of the I-512 on Form I-546 (Order To Appear — Deferred Inspection), which he forwarded to Rocha. That is to say, from the I-546, which Rocha admitted receiving, she should have been aware that Sissoko was in possession of an advance parole document. She therefore had no basis for concluding that Sissoko was an inadmissible arriving alien subject to expedited removal proceedings under § 1182(a)(7).

Rocha contends, in the alternative, that because she suspected fraud, Sissoko was subject to expedited removal proceedings then under § 1182(a)(6)(C). Section 1182(a)(6)(C) provides that any alien who has procured a visa or other docu-

---

> *An*[y] alien whose inadmissibility is being considered under this section or who has been ordered removed pursuant to this section *shall* be detained pending determination and removal, except that parole of such alien, in accordance with section 212(d)(5) of the Act, may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.

8 C.F.R. § 235.3(b)(2)(iii) (emphasis added). The theory underlying statutory expedited removal, presumably, is that any alien who validly falls within that provision, and who does not seek asylum, is automatically subject to immediate *removal*, not detention. We therefore are a bit mystified about the source of the INS's statutory mandate *requiring* the detention of individuals subject to expedited removal (but not seeking asylum) before they are removed.

ment — or admission into the United States — through fraud is inadmissible. However, as the district court noted, contemporaneous documentation does not indicate that the decision to apply the expedited removal provision to Sissoko was based on fraud.

Moreover, even if Rocha did suspect fraud at the time although she did not so state in any official document, two related points are fatal to her argument:

*First*, Sissoko did not procure the advance parole document itself through fraud, even if his *CSS* status may have been based on a misrepresentation. Rocha nowhere contests this point, or suggests that she thought the advance parole document was anything but genuine.

*Second*, to the extent that Rocha alleges that Sissoko's *legalization applications* were based on fraud, she was barred, by the INA itself, from obtaining information elicited during the legalization process and using it to form the basis for a removal proceeding. 8 U.S.C. § 1255a(c)(4)-(5).[31] As we

---

[31]Section 1255a(c)(4) provides a general limitation on access to information in legalization applications. Section 1255a(c)(5)(A)(i) is more specific. In relevant part, it bars the Attorney General or any other official or employee of the INS from

> us[ing] the information furnished by the applicant pursuant to an application filed under this section for any purpose other than to make a determination on the application, for enforcement of paragraph (6), or for the preparation of reports to Congress under section 404 of the Immigration Reform and Control Act of 1986
> . . . .

The only exceptions to the confidentiality provisions authorize disclosure of information for census purposes, *see* 8 U.S.C. § 1255a(c)(5)(C), and "in connection with a criminal investigation or prosecution, when such information is requested in writing by such entity, or to an official coroner for purposes of affirmatively identifying a deceased individual . . . ." *Id.* § 1255a(c)(5)(B). Indeed, § 1255a(c)(5)(E) does create criminal liability, by way of a fine of "not more than $10,000," for any individual who

explained in *Proyecto San Pablo v. INS*, 189 F.3d 1130 (9th Cir. 1999):

> [The Immigration Reform and Control Act of 1986 (IRCA)] expressly forbids the INS from using the legalization process to lure illegal aliens into its control for the purposes of deportation. In order to encourage aliens to use the IRCA process, a firewall of sorts is erected between IRCA applications and deportation proceedings. The INS must learn about an alien's unlawful presence independently of any legalization application in order to initiate deportation proceedings.

*Id.* at 1134 n.1 (citation omitted); *see also Orquera v. Ashcroft*, 357 F.3d 413, 421 n.6 (4th Cir. 2003) ("The confidentiality provision set forth at § 1255a(c)(5)(A)- (E) prevents information provided by an individual in his amnesty application from being used to identify the applicant and begin deportation proceedings.").

Therefore, even if Rocha *did* discover at the time that Sissoko's legalization applications were fraudulent,[32] she could not have used such information to remove Sissoko without breaking the law. Because knowledge that Sissoko's applications were fraudulent thus could not validly have formed the basis for removing him, it follows that such knowledge could

---

"knowingly uses, publishes, or permits information to be examined" in violation of the legalization confidentiality requirements.

Although fraudulent legalization applications cannot form the basis for a removal proceeding, the statute does impose criminal sanctions for applications based on fraud. *See* 8 U.S.C. § 1255a(c)(6); *see also* 8 C.F.R. § 245a.3(n)(3) (authorizing the sharing of information with prosecutors).

[32]At most, Rocha knew that Sissoko had submitted two legalization applications. There are, however, numerous explanations for dual applications that do not necessarily involve fraud.

not have provided a valid basis for detaining Sissoko pending removal.

**[19]** Because Rocha had no legal basis to deem Sissoko inadmissible under either § 1182(a)(7) or § 1182(a)(6)(C), there was no legal basis to identify him as subject to expedited removal and place him in detention under 8 U.S.C. § 1225(b)(1). Rocha therefore violated Sissoko's Fourth Amendment right to be free from unlawful detention.

## B.   Violation of a clearly established right?

To determine whether Rocha may ultimately be held liable for violating the Fourth Amendment, we must next consider "the 'objective legal reasonableness' of [her] action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (internal citation omitted). As the Supreme Court has further elaborated,

> [f]or a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citations omitted). We therefore must ascertain whether Sissoko's right to be free from detention was clearly established at the time that Rocha was acting in August of 1997.

**[20]** Rocha first contends that it was not clear that the Fourth Amendment applies to aliens whose presence here is unlawful. Although Rocha is correct that no Supreme Court case has squarely held that the Fourth Amendment applies to

such aliens,[33] directly on-point Supreme Court case law is not required for a right to be "clearly established." *See, e.g.*, *Prison Legal News*, 397 F.3d at 702 (citing *Sorrels*, 290 F.3d at 970). Our own case law provided Rocha with "fair and clear warning," *Hope*, 536 U.S. at 741, that immigration officers dealing with aliens whose presence here may be unlawful must be solicitous of Fourth Amendment protections. *See, e.g.*, *Orhorhaghe*, 38 F.3d at 497-501; *Zepeda*, 753 F.2d at 725-26 (concluding that the power of INS agents to interrogate, arrest, and detain aliens present in the United States without a warrant is limited by the Fourth Amendment).

In the specific circumstances of the case here, Rocha contends that it was not clearly established that the possession of the proper advance parole authorization, in and of itself, necessarily entitled Sissoko to entry. As discussed above, this contention is irreconcilable with the cases upon which both the IJ and BIA relied. In particular, *Navarro-Aispura* — decided before August 1997 — clearly established, at the time Rocha detained Sissoko, that his possession of a valid advance parole document and his temporary resident status entitled him to re-enter the United States and precluded detaining him as an inadmissible arriving alien,[34] even once his legalization applications were denied.

---

[33]Rocha cites the plurality opinion in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), in which the Supreme Court noted that although it may have assumed in previous cases that Fourth Amendment protections extend to aliens unlawfully present in the United States, that assumption would not be binding in a future case squarely posing the question. *See id.* at 272-73 (plurality opinion) (citing *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984)).

[34]Indeed, *Navarro-Aispura* established that Sissoko's pending legalization application and advance parole document placed him on the other side of the constitutional line created by the "entry fiction" — *viz.*, it was *not* as if Sissoko had been "stopped at the border." *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (citing *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 213, 215 (1953)). The significance of this distinction becomes only more apparent by contrasting this case to our decision in *Wong*, in which the plaintiff *failed* to secure an advance parole document before leaving the United States, and therefore *was* an "arriving alien." *See* 373 F.3d at 970-75 (analyzing Wong's constitutional claims in light of the entry fiction).

[21] Under these circumstances, it would have been clear to a reasonable immigration officer that detaining Sissoko would violate his Fourth Amendment rights. We therefore conclude that Rocha is not entitled to qualified immunity for her actions.

## V.   CONCLUSION

For the reasons set forth above, the district court's denial of Rocha's motion for summary judgment on the basis of qualified immunity, its grant of summary adjudication to Sissoko on the false arrest claim, and its denial of Rocha's motion for reconsideration are AFFIRMED. The case is remanded for proceedings consistent with this opinion.

**AFFIRMED and REMANDED**.